## O'SHAUGHNESSY et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.
February 5, 1927.)

### No. 4819.

**1. Criminal law ⬉762(5)—Federal judge may comment on evidence and express opinion on guilt, but must do so fairly, accurately, and impartially.**

Judge in federal court may comment on evidence and express his conclusions as to guilt of accused, so long as he is impartial therein, does not make his comments in favor of or against one side only, and, if stating the evidence, states it fairly and accurately, that favorable, as well as that unfavorable, to accused.

**2. Criminal law ⬉762(5)—Charge commenting on evidence and guilt held bad, in not referring to favorable, as well as unfavorable, evidence.**

Parts of charge, on prosecution for conspiracy to violate National Prohibition Act (Comp. St. § 10138¼ et seq.), *held* bad, in not reciting the evidence impartially, and referring to and stressing only evidence of guilt.

**3. Criminal law ⬉779—Charge held calculated to mislead jury to believe that fact of coindictees having pleaded guilty could be considered against defendants.**

Part of charge on prosecution for conspiracy to violate prohibition law *held* bad, as calculated to mislead jury to believe that the fact that coindictees had pleaded guilty could be considered in determining guilt of defendants.

**4. Criminal law ⬉823(2)—Stating that jury could disregard court's views of guilt held not to cure fault of charge in submitting only unfavorable evidence and arguments.**

Fault of charge in submitting only unfavorable evidence to defendants, and arguing only on side of guilt, *held* not cured by stating that jury could disregard court's views.

In Error to the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Patrick J. O'Shaughnessy and others were convicted of conspiracy to violate the National Prohibition Act, and certain defendants bring error. Reversed and remanded for new trial.

J. H. Webb and Samuel M. Johnston, both of Mobile, Ala., for plaintiffs in error.

Nicholas E. Stallworth, U. S. Atty, of Mobile, Ala.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. The indictment in this case charged 71 persons with conspiring to sell intoxicating liquors in Mobile, Ala., in violation of the National Prohi-

bition Act (Comp. St. § 10138¼ et seq.); the alleged conspiracy including the obtaining for those engaged in such selling immunity from arrest for so doing. Six of the accused pleaded guilty. The trial of 62 of them began April 28, 1924, and the case went to the jury on May 21, 1924, without counsel on either side making any argument to the jury. Eleven of the accused were convicted, including Patrick J. O'Shaughnessy, who was chief of police of Mobile during the time of the alleged conspiracy, and George L. Donoghue, who during that time was chief deputy of the sheriff of Mobile county. The case is before us on writs of error sued out by O'Shaughnessy and Donoghue.

Many assignments of error are made in behalf of each of them. We find it necessary to discuss only those assignments of error which are based on exceptions to parts of the court's charge to the jury. In that charge the presiding judge recited at length much of the testimony in support of the charge made, and stated his conclusions as to the guilt or innocence of the several accused. Exceptions were reserved to the following, among other, parts of that charge:

"Now, that brings us to another official; that is, Mr. O'Shaughnessy. You remember Mr. Howell testified he was employed as Mr. O'Shaughnessy's clerk in the police department; that, when the Crawford campaign was coming along, he was told by O'Shaughnessy to get after the liquor dealers and make them contribute to this fund, and he commenced raiding, and he told you as a result that he got contributions from the liquor people, which were turned over to Mr. O'Shaughnessy. You remember Pennington testifies to a raid on Bob Thomas. He was this same darkey I referred to before—a pool room. And then he goes on to tell you that after he had found the liquor, not in the pool room, but outside, that he was called to the telephone, and Mr. McEvoy spoke to him and told him not to take that liquor off, but let it alone, and he said he would, and he went on, and in a few minutes he was called again to the 'phone, and then the chief of police, Mr. O'Shaugnessy, told him to do whatever McEvoy said. Now, these conversations were denied by the other parties, but the other officer who was there with him does testify, as I recall it, that he was called to the 'phone; he never knew about what took place as to what was said, but he was called to the 'phone. Now, Lieutenant Adams testifies about these same transactions, and about instructions that the chief gave him about these

liquor dealers, and a list which he had of men who were not to be raided. Chief O'Shaughnessy denies that. Then there was testimony by Mr. Pennington about a raid which he and Mears made on a street where there was an immoral house, and when they came in the chief of police got after them about it, and wanted to know if they were going to run that office. They said they saw the offense committed, and the chief got very angry. If you will remember there was another witness, the police officer, who testified about living right across the street, and the trouble his family was having, because the opposite neighbors was dealing in liquor and making it very objectionable, and the chief asked him if he knew that, and he told him it was under cover, and it eventually came to the time when he told this man to go somewhere else. Then I believe there was Officer Pennington, who spoke of one of these places down there where the chief told him he did not want him to bother, because that was where Sid Lyons and Espalla went to play cards and get their beer. Then Mr. Zuckerman testifies, you remember, that he paid on the Crawford campaign $100; that he paid that to Officer Ollie Hubbard. Ollie Hubbard, you remember, gentlemen, was the officer who testified, and later on Chief O'Shaughnessy testified was the man who drove him to the station down there when he left Mobile. As the chief said, he left to keep from being pestered by people asking him about the indictment, and that Ollie Hubbard drove him to the station. Now, I have already spoken to you, when I was speaking about the case against Mr. McEvoy, about the testimony as to Moody given by Tom Corso, and the same testimony is applicable here to the chief. Tom took the stand, and he said he was paying $25 a month to Moody, and that McEvoy came to him and told him to make a contribution to the campaign, and he agreed to do it, and McEvoy told him that, if he did, he would not have to pay any more to Moody. Schreiner says he and Medicus paid $750 to the Crawford campaign, but did not know to whom it was paid.

"Now, gentlemen, right here there is one piece of evidence, and its bearing needs to be considered. There is the testimony of a number of these witnesses that Chief O'Shaughnessy did give protection by raising this fund for the Crawford campaign from the bootleggers, liquor dealers, and in consideration of that he did give protection. Now, if you remember, Mr. Joe Rich was put on the stand, who testified he was chairman of the campaign committee, and he produced the list of this committee. He then testified that not $1 was ever paid to his committee, or to him as chairman, or spent by his committee as having been paid by O'Shaughnessy or anybody else. So, if a contribution—a collection—was taken up by Chief O'Shaughnessy, then, certainly, he never paid that for the campaign expenses. Now, did he collect it? If so, what did he do with it? There is the testimony, and there is the question. Howell says that the chief told him that, if it was not used in the campaign, it was to be split four ways, between Howell, O'Shaughnessy, Crawford, and Hanlan.

"Now, Howell, you will remember, was the chief's clerk. He was the young man who got in trouble by shooting his pistol off down here, and had to leave the city's employment, and he acted as chief of police in the absence of Chief O'Shaughnessy, and was associated with him intimately and personally, a trusted man, and letters of reputation were given to this man when he went off; and yet he was attacked, of course, as is usually the case, for coming back and testifying. It was shown that he went, when he came back, to the chief of police, and asked for money, and that he went to Mr. Crawford, and asked for money. Mr. Howell says he asked for it for the purpose of employing a lawyer, and the telegrams which passed between him and the chief, discussing the question of getting a job for him, and Howell says that the chief told him he would arrange to get him a job running a gambling house just outside the city when he came back. Now, that is the testimony. Taking the relations between Howell and the chief, if Howell was the kind of man that the criticism indicates, it looks like the chief should know something about it, the character of life he was leading, the way he was drinking and going on—carousing—which he undoubtedly was doing. If the chief shut his eyes to that, what is the matter?

"Now, these are the circumstances which lead me to believe that the chief did raise a fund and the chief did agree to give protection to certain bootleggers. * * * The proofs shows in this case by a number of witnesses that French was a man who had a bad reputation, and these witnesses would not believe him on oath; but that is not all the proof shows. The proof shows that this man had this reputation for three, four, or five years back. The proof shows that these men who testified to his reputation, who are defendants, knew of that reputation. Now, let me ask you, if a man who deals with another man, knowing that his reputation is such that nobody would believe him, if he is

in such position to deny the testimony that that man gives when he comes to testify as to the transactions between them—hasn't he dealt with a man who is unworthy of belief, knowing him to be so, and knowing that, if that man ever undertook to testify against him, he would not be believed, and therefore put himself on the same plane as the other man? That is for your consideration. Now, I listened to French's testimony, and I like to give the devil his dues. He testified to transactions with nearly every defendant in the courtroom. He testified in a manner which showed he was very familiar with what he was talking about. He testified in a very frank manner, except when they pressed him about promises he made, or what he said, and then he did evidently dodge about, whether he would give them any protection or not. Now, you take his story, and give the devil his dues, knowing that these men dealt with him, knowing him to be a man who would not be believed, and yet, as it is shown, they paid him, some of them, and contributed to him, in the course of two years, between $18,000 and $20,000. Now, if he got that money, he got it from bootleggers, and much of it from these defendants here in this courtroom, and they paid it to him, knowing he was a man of that sort of reputation. You heard his testimony. As I charged you, a man who will testify falsely in one thing, you have a right to disregard his testimony; but I am merely calling your attention to the relevancy and the weight of French's testimony, in connection with the facts testified to in this case, and I think it is nothing but just that I say that to you men, so that you may have French's testimony before you in a fair light, even though he bears that sort of reputation. * * *

"So the question is, was there a conspiracy in the first place. Well, let's see: Six men have pleaded guilty to the fact that they conspired in this case. They are Charles Schreiner, Jacob Zuckerman, John T. McNamara, Isadore Maisel, Lloyd Dillard, and Isadore Berman. Here are six men who pleaded guilty to a conspiracy, this very conspiracy these other men are being prosecuted for. Here is the testimony I have given you in brief, given against them. It seems to me the evidence shows there was a conspiracy, and these men I have discussed and named were guilty of entering into that conspiracy."

The grounds of the first-mentioned exception were stated as follows:

"Because, in said portion of said charge, the court, in commenting on the inculpatory testimony against this defendant, gave undue prominence to the inculpatory testimony, without summing up all the testimony, as well for as against this defendant, and, in stating the inculpatory testimony, states it in a way that has the effect of an argument against this defendant, and that such comment was not a full and proper summing up of all the facts testified to with reference to this defendant, and, further, because said charge was not a calm, accurate, and judicial statement of the evidence in the case, but was a one-sided argument against this plaintiff in error, and because the judge's comments upon the facts were not judicial and dispassionate, and so carefully guarded that the jurors, who were triers of the facts, were left free to exercise their independent judgment, and because said portion of said charge put every deduction which could be drawn against this plaintiff in error, and omitted or disregarded the converse aspect, and because said portion of said charge invaded the province of the jury, and deprived this plaintiff in error of due process of law, guaranteed to him by the Fifth Amendment to the Constitution of the United States, and denied to this defendant a trial by an impartial jury, guaranteed to him by the Sixth Amendment to the Constitution of the United States."

The part of the charge which dealt specifically with the evidence against Donoghue was excepted to. For the reason stated below, that part of the charge, which was quite lengthy, is not set out. The charge contained statements to the effect that, while the court's conclusions from the evidence were frankly expressed, those conclusions were not binding on the jury, that it was the province of the jury to pass on the guilt or innocence of the accused, and that the jury had a perfect right to disregard the court's views on that subject. The jury did not adopt all the court's expressed conclusions that named accused were guilty. There was considerable testimony tending to contradict and discredit the testimony of the witness Pennington, which was referred to in an above set out part of the court's charge. Such contradicting and discrediting testimony was not mentioned in the charge. Considerable testimony contradicting that of Howell, a witness for the prosecution, which was referred to by the court, was not mentioned or referred to in the charge, otherwise than by the statement: "And yet, he was attacked, of course, as is usually the case, for coming back and testifying." The testimony of French, a witness for the government referred to in an above set out part of the charge, was contradicted in material

respects by the testimony of several witnesses for the accused. That contradicting testimony was not mentioned in the charge.

[1-4] While it is permissible for a federal judge, presiding in the trial of a criminal case, to comment on the evidence and to express his conclusions as to the guilt or innocence of the accused, he is under a duty to be impartial in doing so, not to make his comments in favor of or against one side only, and, if he states the evidence, he should state it fairly and accurately, both that which is favorable to the accused and that which is unfavorable. When there is evidence supporting a verdict of not guilty, argumentative statements, based on recitals of incriminating evidence only, are not warranted, and what is said as to evidence referred to should not be misleading as to the relevancy or probative value of such evidence. Starr v. United States, 153 U. S. 614, 14 S. Ct. 919, 38 L. Ed. 841; Hickory v. United States, 160 U. S. 408, 16 S. Ct. 327, 40 L. Ed. 474; Weare v. United States (C. C. A.) 1 F.(2d) 617. We are of opinion that exceptions to parts of the court's charge were well taken. The court's recital of the evidence with reference to O'Shaughnessy lacked impartiality, as only evidence of his guilt was referred to and stressed; that tending to prove his innocence not being stated or commented on. The part of the charge dealing specifically with the evidence as to Donoghue is subject to similar criticism. It was not set out, because it was similar to the part of the charge dealing with the evidence as to O'Shaughnessy.

What was said as to French, a witness for the government, was an argument in support of his testimony, unaccompanied by any statement of, or comment on, other testimony which directly contradicted that of French. The last above set out part of the charge was calculated to mislead the jury to conclude that the fact that six of the persons who were indicted pleaded guilty properly could be considered in determining whether those on trial were or were not parties to the conspiracy charged. That fact tended to prove nothing against the accused who pleaded not guilty. General statements in the charge, to the effect that the jury were at liberty to disregard the court's views as to guilt or innocence, and to base their verdict on their own conclusions from the evidence, did not cure the fault in the charge of a lack of impartiality in submitting the evidence to the jury, or justify the court in making one-sided recitals of evidence, or in furnishing arguments in behalf of only one side of issues as to which the evidence was conflicting.

Other rulings complained of need not be considered, as the questions involved may not be presented in another trial. Because of the above-mentioned errors, the judgment is reversed, and the cause is remanded for a new trial.

Reversed.