[Crim. No. 3936. Second Dist., Div. One. Jan. 28, 1946.]

THE PEOPLE, Respondent, v. HARRY V. MASON, Appellant.

Everett W. Leighton and Gerald Bridges for Appellant.

Robert W. Kenny, Attorney General, and L. G. Campbell, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County defendant was accused of the crime of murder. Following entry of a not guilty plea and trial before a jury, he was convicted of the crime of manslaughter, a lesser and necessarily included offense. From the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

The circumstances out of which this prosecution arose may be thus epitomized: On the afternoon of November 9, 1944, defendant and appellant, Harry V. Mason, was a guard employed by California Shipbuilding Corporation. He wore a guard's uniform furnished by the United States Maritime Commission and a holster, in which was a pistol. His duty at that time was to enforce the rules and regulations of his employer and the United States Maritime Commission respecting ingress and egress to and from the CalShip yard through "Gate 3," where he was then stationed. "Gate 3" designated a series of gates, at one end of which was a room where persons not entitled to enter the shipyard might wait and a small office with windows facing one of the gates called the "office gate," through which persons (other than employees on change of shift) were required to enter or depart; to present proper passes, identify themselves and sign a register, and at the other end of which was the paymaster's office. Employees were required to use the "office gate" except for the usual change of shift. Just before, after and during change of shift, each gate in the series known as "Gate 3"

was opened and a guard was stationed at each. Only defendant and one other guard at that gate carried guns. At 4:30 each afternoon the "swing shift" started work and the "day shift" came out. Just prior to 4:30 guards were required to allow no one to pass through Gate 3 except members of the "swing shift" wearing their badges on "their left breast" and carrying proper identification cards. Guards were also required to examine packages carried by employees. Immediately after 4:30 guards similarly scrutinized and examined those leaving with the "day shift." The first whistle blew at 4:25 and the second at 4:30.

At 4:25 p. m. on November 9, 1944, Gerald Brackett Edwards, a colored boy about 18 years old, "broke through the gate to run, but he was stopped by Officer Mason . . ." and told to come back "and clear out the proper gate." The testimony of the various witnesses discloses some differences in what was seen and heard by them after Edwards was told to go back, but several witnesses for the prosecution, as well as witnesses for the defense, testified that Edwards then called defendant a vile name and said he would not go back, "and he started to push his way by Mr. Mason . . . Mr. Mason laid his hand on his gun, and Edwards told him to go ahead and pull it, that he wasn't afraid of that peashooter, and again he tried to go by, and Mr. Mason pulled his gun out and leveled it towards Mr. Edwards, and the colored boy made a grab for the gun, and it went off." The gun was pointed towards the man's feet or legs. After the first shot was fired, "then he jumped at Mr. Mason" and Mr. Mason stepped back and another shot was fired. According to the expert from the Los Angeles Police Department, the gun was between six and ten inches from the body of deceased when fired. One of the shots entered Edwards' abdomen, causing his death shortly thereafter.

The main ground urged for a reversal of the judgment and order herein is that the trial court exceeded the bounds of propriety and went beyond the power conferred upon it by section 19 of article VI of our state Constitution to "make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case." Though the language of the Constitution is in itself devoid of any limitation as to the comment the court may make on the evidence and the credibility of witnesses, it does not follow that the

conferred power is plenary and without restriction or limitation. Indeed, as was said in *Quercia* v. *United States,* 289 U.S. 466 [53 S.Ct. 698, 77 L.Ed. 1321], quoted with approval in *People* v. *Ottey,* 5 Cal.2d 714, 724, 725 [56 P.2d 193]: "This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the testimony, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be let without safeguards against abuses."

Notwithstanding the numerous occasions upon which the trial court's conduct under the aforesaid constitutional provision has been before the appellate tribunals, such cases are helpful only so far as they enunciate certain general principles. No hard and fast rule can be laid down determinative of what a trial judge may say to a jury by way of comment on the evidence or the credibility of witnesses. Each case must turn upon its own peculiar circumstances. As was said in *People* v. *Ottey, supra,* at page 724, "That question must depend, in a criminal case, upon the nature of the charge, the nature of the evidence, and, to some extent, on the arguments of counsel—in short, upon all of the circumstances of the case. 'It is impossible, however, from the cases to find the dividing line between what is objectionable and what is not, and to lay down a hard and fast rule by which the doubtful cases can be placed on one side or the other of the dividing line. . . . (reviewing cases.) . . . It is evident from an examination of these cases that each case, in a large measure, stands on its own bottom, except as to the recognition of certain general principles.' (*Malaga* v. *United States,* 57 F.2d 822, 827, 828; *Stokes* v. *United States,* 264 F. 18; *People* v. *Lintz,* 244 Mich. 603 [222 N.W. 201].)"

In the case with which we are here concerned the record reveals that the jury was instructed and the cause submitted to them at ten o'clock on the morning of April 6, 1945, without any comment by the judge upon the evidence or the credibility of witnesses. The jury deliberated all of that day, all day Saturday, April 7, and Sunday, April 8. On Monday, April 9, after the jury had been deliberating three full days, the trial judge on his own motion called them before him,

and in the presence of the defendant, his counsel, and the district attorney, announced: ''Owing to the fact that we, in our opinion, do not regard and have never regarded the case as one of any particular complications, but is rather simple of solution, we feel that we not only have the privilege of discussing the case with the jury but a positive duty to discuss the evidence in view of the impasse which has developed.'' At the conclusion of his comments on the evidence the trial judge gave to the jury two additional instructions in writing.

Appellant contends that all of the somewhat lengthy comment made by the trial judge was erroneous and prejudicial. Because of the diversity of subjects contained in the questioned comments and for convenience, as well as clarity, we shall discuss seriatim the subjects covered, commencing with the following:

''The first matter which I think should be disposed of is suggested by a question which one of the jurors asked, or suggested that *the jury would like to know about the rules of the Maritime Commission.* All I said at that time in response to that request was that all of the evidence which we deemed material had been presented to the jury, and dropped the matter there. I feel that I should go further and say that *the Maritime Commission has nothing whatever to do with this case,* and even if the defendant had been in the employ of the Maritime Commission, from the evidence which we have here, it still would have made no difference, *because the matters which you must decide rest entirely in the brief time in which the instant offense or transaction occurred—a matter probably of not more than two or three minutes, at the most, and the matter must necessarily be determined on that basis.''* (Emphasis added.)

While it is true in the instant action that the entire incident took place between the ''first'' and ''second'' whistles, which were blown at 4:25 and 4:30 p. m., respectively, it is not required that those few minutes be isolated and considered without regard to the general nature of the period of time of which they are a part.

A search of the reporter's transcript does not reveal the question asked by a juror with reference to the rules of the Maritime Commission but from the foregoing remarks of the court we shall assume that such a question was propounded. Evidently the juror desired to know what the rules of the

Maritime Commission were with reference to people entering and leaving the shipyards and what responsibilities, duties and rights the defendant had in the course of his employment to prevent the ingress and egress of people except through designated entrances and exits and when they were in possession of the requisite passes. ■ One of the limitations upon the power of a trial judge in commenting upon the evidence is that he may not withdraw any material evidence from the consideration of the jury. (*People* v. *Ottey, supra,* p. 728.) ■ The court was entitled to take judicial notice of the fact and to instruct the jury that they could take notice of the fact that on November 9, 1944, the date of the alleged offense, the United States was at war, and could also take notice of Congressional Declarations and Presidential and Executive proclamations made in connection with the prosecution of the war. (31 C.J.S. 639, § 62.) ■ Judicial notice can be taken of the fact that constant attempts were being made throughout the war to work harm to American ships, not on the high seas alone, but in our own ports and shipyards. (*Pan-American Pet. Transp. Co.* v. *Robins Drydock & Repair Co.,* 281 F. 97, 259 U.S. 586 [42 S.Ct. 589, 66 L.Ed 1076].) In *Ex parte Lincoln Seiichi Kanai,* 46 F. Supp. 286, 288, the United States District Court for the Eastern District of Wisconsin said, ". . . The field of military operation is not confined to the scene of actual physical combat. . . . The theater of war is no longer limited to any definite geographical area. Saboteurs have already landed on our coasts. This court can take judicial notice of the extensive manufacturing facilities for airplanes and other munitions of war which are located on or near our west coast. . . . At the present time, the right of our citizens to come and go as they please may be somewhat restricted by the necessity of protecting this nation from our enemies in time of war." The President of the United States, pursuant to the war powers vested in him by Congress, by Executive Order No. 9066, dated February 19, 1942, stated that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities," and the Secretary of War and military commanders designated by him were authorized (50 U.S.C.A. § 104) to prescribe military areas from which any and all persons might be excluded, and with respect to which the right of

any person to enter, remain in or leave shall be subject to whatever restrictions may be by them imposed. Lt. Gen. DeWitt's Public Proclamation No. 1, on March 12, 1942, designated Military Area No. 1, which included Terminal Island, where the yard of CalShip was located. The trial court instructed the jury that Terminal Island is located in Los Angeles County. ▮ It is also common knowledge that it is on the Pacific coast line at Los Angeles Harbor, and, at the time involved, was one of the most important shipbuilding and repairing installations in the United States. It is also common knowledge that hundreds of thousands of men and women were there engaged in such work.

In the case of *In re Parker*, 57 Cal.App.2d 388, 392 [134 P.2d 302], Division Three of this court said: ''. . . We also take judicial notice of the facts that at these times there were in Los Angeles County . . . a large number of factories engaged in making for the United States and other governments a variety of articles used or useful for war and defense purposes, that these factories employed many thousands of men in their work and were rapidly increasing the number of their employees, that they demanded of all applicants for employment proof of United States citizenship. . . .''

It was ''common knowledge that the government was at that time greatly interested in the building of ships to be used by it for the transportation of men, munitions and supplies.'' (*Southern Bridge Co.* v. *United States Shipping Board Emergency Fleet Corp.*, 266 F. 747, 749.)

The United States Maritime Commission was created as successor to the United States Shipping Board (which was held in the last-cited case, at page 752, to be ''an agency of the government'') and was authorized, among other things, to ''procure new vessels'' for use ''as auxiliaries to the naval and military services of the United States'' (46 U.S.C.A. §§ 891c, 1111 et seq.) and ''to adopt all necessary rules and regulations to carry out the powers, duties, and functions vested in it'' (§ 1114). Between 1941 and 1944 billions of dollars were appropriated by Congress for use by the commission ''For the purpose of providing as rapidly as possible cargo ships essential to the commerce and defense of the United States . . . ; the establishment, acquisition, construction, enlargement, or extension of plants or facilities . . . to be used for the construction of ships . . . and the maintenance, repair, operation (under lease or otherwise), and manage-

ment of such plants and facilities . . ." (§ 1119a, ch. 27, title 46, U.S.C.A.; § 632, Second War Powers Act, title 50, U.S.C.A.; Exec. Order No. 9129).

■ It is common knowledge that the war plants on the Pacific Coast made a practice of instructing all new employees concerning the rules and regulations with respect to entering and leaving their plants, wearing badges, carrying identification cards, the necessity for cooperation with the guards, and particularly with respect to the provisions of the Espionage Act, which reads in part as follows:

"Whoever, for the purpose of obtaining information . . . goes upon, enters . . . any place in which any vessel . . . (is) being made . . . on behalf of the United States . . . ; or (e) whoever, being intrusted with or having lawful . . . control of any . . . information, relating to national defense, through gross negligence permits the same to be . . . stolen . . . shall be punished by imprisonment for not more than ten years and may, in the discretion of the court, be fined not more than $10,000." (Title 50, § 31, U.S.C.A., enacted June 15, 1917, amended March 28, 1940.)

■ It was also customary for all such concerns to keep uniformed and armed guards at all gates, as well as in other parts of their plants. It is common knowledge that in a large shipyard such as CalShip, where the homicide in question occurred, no one knew the faces of all employees and could thus determine who was entitled to be upon the premises; that few, if any, foremen were able to recognize all the men and women of their own groups; that even old and well-known employees often had their faces so marred by soot and grease or so obscured by helmet or goggles that even close friends would not recognize them. Under such conditions, if rules and regulations respecting ingress and egress from such a shipyard were not enforced, it would be sheer luck if the ships being manufactured for the war necessities of the United States proved seaworthy.

In the instant action there was testimony as to the existence of such rules, as to the instruction of "new hires" respecting them, and that the rules were rules of CalShip and United States Maritime Commission, which were "the same."

■ While, as heretofore pointed out, the trial judge may exercise his own discretion with reference to the comments he makes, he abuses that discretion when in his comments he withdraws any material evidence from the jury's consideration. (*People* v. *Ottey, supra,* p. 728.)

Because there was evidence in the case at bar as to the nature of defendant's employment and the rules of his employer, CalShip, and the United States Maritime Commission, it must be held that when the jury made known their desire "to know about the rules of the Maritime Commission" the court erred in advising them that "the Maritime Commission has nothing whatever to do with this case," because in so doing the court in effect withdrew from consideration by the jury evidence affecting the rules of both defendant's employer, CalShip, and the United States Maritime Commission which the defendant was required to enforce. If the court desired to comment upon such evidence it should have done so by referring to the same in the light of the foregoing facts, of which the court took and the jury was entitled to take judicial notice. It was only fair to the defendant that the jury be permitted to judge of his conduct in the light of the nature of his employment and the duties and responsibilities thereof, measured by the foregoing facts of which the triers of fact were entitled to take judicial notice. The very inquiry of the jury was indicative of the fact that they desired to know what the evidence was with reference to the obligations imposed upon the defendant by reason of the rules of the Maritime Commission, which commission was authorized by section 1114 of title 46 of the United States Code "to adopt all necessary rules and regulations to carry out the powers, duties and functions vested in it." In view of the prevailing facts and circumstances surrounding this case, to dismiss the jury's request with the terse comment that "the Maritime Commission has nothing whatever to do with this case" and that the "matters which you must decide rest entirely in the brief time in which the instant offense or transaction occurred,—a matter of not more than probably two or three minutes at the most—" tended to prevent the defendant from having a fair and impartial trial and does not come within the letter or spirit of the pertinent constitutional provision authorizing comment by the trial court upon the evidence or the credibility of witnesses.

We shall now give consideration to the following portions of the comments made to the jury upon the evidence after the jury had been deliberating thereon for three full days:

"Now, I want to say that *I have never been able to see in the evidence in this case from any witness, any circumstance, any reason or justification for the defendant drawing his gun*

*at all,* and if there was no justification for that, why, then we have, I think less difficulty to surmount in arriving at a disposition of the case. . . .

"Now, I said in the beginning that I haven't been able to discover any evidence which justified any conclusion that the defendant, at any time, had any occasion to draw his gun; . . .

". . . Now, that is why I say that *I see in the evidence nowhere anything which justified the defendant in drawing his gun at all. Certainly, no common sense would indicate that any rules of any sort would require that of a man,* because the other man violated the rule and with no more apparent reason than has been conveyed here.

" . . . *'A person cannot deliberately create a dangerous situation, either unlawfully or negligently, and thereafter be absolved from blame from some accidental or unintentional disaster which could not have happened but for the dangerous situation voluntarily and unnecessarily created.'*

". . . *On the other hand, your own authority to judge the evidence and to determine the facts in the case has this limitation: It is not an arbitrary power but must be exercised with sincere judgment and in accordance with the rules of law stated to you.*"

 The defendant was obligated and in duty bound to enforce the rules relating to ingress and egress to and from the shipyards on Terminal Island. This duty was enjoined upon him by duly promulgated rules made pursuant to the war power of the national government. Peacetime procedures do not necessarily fit wartime needs. (*Hirabayashi* v. *United States,* 320 U.S. 81 [63 S.Ct. 1375, 87 L.Ed. 1774].) In the case at bar there is no evidence that the deceased showed his badge or said he was an employee until after he was shot. And even though he was an employee, he was required to obey the rules respecting exit between shifts. Not having done so, the defendant in his capacity as a guard had no way of knowing in what manner, authorized or unauthorized, the deceased gained entrance to the shipyards or what he had done while there, or what he might be taking from there. The question of whether the evidence "justified the defendant in drawing his gun" was a question of fact to be determined by the jury in the light of all the facts and circumstances to which we have herein adverted. To tell the jury that the defendant was without justification in drawing his gun was tantamount to instructing the jury that the shooting was

unlawful, for if there was no authority for the defendant to draw his gun certainly there was no justification for him to shoot the deceased. This was the ultimate fact to be decided by the jury, and what the court said was for all practical purposes an instruction that the defendant was guilty. The constitutional provision authorizing a trial judge to comment on the evidence does not justify any such invasion of the province of the jury. (*People* v. *DeMoss,* 4 Cal.2d 469, 477 [50 P.2d 1031] ; *People* v. *Talkington,* 8 Cal.App.2d 75, 96 [47 P.2d 368]. While the court did instruct the jury that they were ''the exclusive judges of the credibility of the witnesses and of all questions of fact submitted to you,'' nevertheless, as was said in *O'Shaughnessy* v. *United States,* 17 F. 2d 225, quoted with approval in *People* v. *Talkington, supra,* at page 96, ''General statements in the charge to the effect that the jury are at liberty to disregard the court's views as to the defendant's guilt or innocence, and to base their verdict on their own conclusions from the evidence, do not cure the fault in the charge of a lack of impartiality in submitting the evidence to the jury, or justify the court in making one-sided recitals of evidence, or in furnishing arguments in behalf of only one side of issues, as to which the evidence is conflicting.''

In the case of *State* v. *Place,* 20 S.D. 489 [107 N.W. 829, 11 Ann.Cas.1129], quoted with approval in *People* v. *Talkington, supra,* at page 89, the Supreme Court of South Dakota had before it some of the questions here under consideration and wherein the jury was returned into court after they had been deliberating, in holding the comments of the court erroneous, the following language was used:

''In this enlightened age no one will contend that a verdict should stand which does not, at least presumptively, express the free and deliberate judgment of those who rendered it. The old rule permitting the coercion of juries has been swept away. Under modern methods of procedure the independence of the jury is, and it should be, respected. *People* v. *Sheldon,* 156 N.Y. 268, 50 N.E. 840, 66 Am.St.Rep. 564, 41 L.R.A. 644.''

In *People* v. *Talkington, supra,* at page 88, the court quotes from Bowers on ''Judicial Discretion of Trial Courts'' as follows:

''It is a well settled canon of practice that a trial judge has no authority, either by threat, intimidation, *undue urging,*

*or inapt suggestions,* to affect the fair, conscientious and impartial deliberations of the jury. The fact-finding body of the mixed tribunal should be as unhampered and unfettered in the performance of its proper functions as is the judge in his. As the presiding officer of the forum, the administrator of the proceedings, the trial court may advise an unagreed jury of the importance of their reaching a verdict if they can do so without surrendering their conscientious convictions, but he cannot go beyond this and say anything to the prejudice of either party." (Emphasis added.)

In 40 Corpus Juris Secundum 960, section 100, we find the following: "Homicide necessarily or inadvertently committed by a public officer or one acting under his authority, while in the exercise of his authority or duty, is generally justifiable or excusable."

Throughout his entire lengthy comments to the jury the trial judge said not one word relative to testimony in favor of the defendant, but alluded to and stressed only the evidence of his guilt. For instance, no mention was made of the testimony that at the time the fatal shot was fired the defendant was retreating, while the victim was advancing upon him. No reference was made to the undisputed evidence of Ray Pinker, the police department expert, whose qualifications were stipulated, and who testified that at the time of the firing of the fatal shot the deceased was only eight inches from the muzzle of defendant's weapon, which the witnesses testified was held at the defendant's hip. Nothing whatever was said of or concerning the threatening language used by the deceased as he advanced upon the defendant, nor was anything said about the testimony that before the second shot was fired the deceased "jumped at" the defendant. The comments therefore lacked impartiality and indicated the assumption by the court of the role of an advocate. In *People* v. *Dail,* 22 Cal.2d 642, 658 [140 P.2d 828], the Supreme Court said:

"The trial court, under the guise of comment, may not properly control the verdicts by a direction either directly or *impliedly* made."

While the trial court may advise the jury in respect to the facts, he must ever keep in mind that the ultimate decision of issues of fact must be fairly left to the jury. In the instant case the jury had been patiently deliberating for three full days and were unable to agree. They were then called into court and advised that no justification whatever existed for

the defendant to draw his gun and that the issue lay between manslaughter and second-degree murder. While it is established law in California that the judge may comment on the evidence and the credibility of witnesses after the cause has been submitted to the jury with the instructions (*People v. Talkington, supra*), nevertheless we are impressed that such a procedure should be resorted to cautiously and when decided upon should be indulged in a most temperate and dispassionate manner, to the end that comments made at such a time will not make more of an impression upon the minds of the jurors than the court desires, or than it properly should make or properly would have made if the comments had been delivered at the time the court instructed the jury prior to the submission of the case to them. In the case at bar, after three days of deliberation fruitless of agreement upon a verdict, we find the jury retiring after the court's belated comment on the evidence and within four hours dutifully returning into court with a verdict of guilty. Under the facts and circumstances here present we are impelled to hold that the jury's verdict was unduly influenced by the court's comments and the arguments advanced by the court in support of its expressed view that not only was the defendant guilty of either second-degree murder or manslaughter, but that at no time was he justified in even drawing his gun.

 The prejudicial effect of the court's comments was further manifested by the fact that at the time of making the comments an erroneous instruction was given by the court, as follows:

"Now I think I will not prolong the matter further. I have given you what I think is the key which will unlock this case, and you are not bound to follow my advice at all, of which I will presently advise you; but in order that we may clarify one point, and that is if you are to adopt the theory of manslaughter, an unintentional slaying, you should be governed by this, which I have written out, and it adds somewhat to a more detailed instruction already given you, in connection with involuntary manslaughter, which reads as follows: 'A person cannot deliberately create a dangerous situation, either unlawfully or negligently, and thereafter be absolved from blame from some accidental or unintentional disaster which could not have happened but for the dangerous situation voluntarily and unnecessarily created.' "

A search of the record reveals no testimony that the defendant had unlawfully or negligently created a dangerous situation resulting in "some accidental or unintentional disaster." ██ The court should give only such instructions as are applicable to the evidence in the case and not to some theory that might be advanced. "The instructions given to a jury must always be adapted to the evidence and the circumstances of the case on trial." (8 Cal.Jur. 321 and cases therein cited.) ██ The foregoing instruction was evidently predicated upon that portion of the trial judge's comments wherein he said:

"Now, the defendant has interposed here, at some length, and you have been instructed at some length, on the matter of self defense. At the same time, the defendant, in testifying here, said that he never intended to shoot the deceased and that it was all an accident. The two positions are entirely inconsistent, because self defense implies an intention to assault his antagonist, or at least to wound him so that he can't proceed any further. It is entirely inconsistent with the idea of an accident. *Now, the defendant here, as I have indicated, testified that he accidentally stepped back from the victim rushing toward him, dropped back on his heel, thereby lifting his gun and that the entire transaction was accidental.* The statements, two of them, one an oral statement and the other a written statement which he made on the afternoon of the transaction, said nothing about any such mishap at all, but stated other reasons for the unfortunate occurrence; but here he has stated that it was accidental, and as I have indicated, the two positions are entirely inconsistent. If you adopt the theory of self defense, then you have got to adopt the theory that he intended to shoot the boy. If you adopt the theory of its being accidental, why then you have got the other matter to consider."

We are impressed that the foregoing comment was based upon an erroneous interpretation of the defendant's testimony wherein he used the word "accidental," because a perusal of such testimony does not warrant the conclusion that the defendant intended to convey the impression that the firing of the shots was accidental, but that the killing of the deceased was unintentional and accidental; that he fired the shots at the decedent's legs, but because he slipped on his "bad foot" the weapon, instead of discharging in the direction of de-

cedent's legs, discharged into his body. The pertinent testimony in that regard reads as follows:

"Q. Where did you aim the gun when you fired it? A. Towards his leg.

"Q. So then at the time you fired the second shot you didn't fire that in self defense then, is that right? A. I fired the shot accidentally, sir.

"Q. Entirely involuntarily on your part? A. I did not intend to kill anyone or to shoot anyone.

"Q. Were you intending to fire the shot at all? A. If I intended to fire the shot I was going to fire it in the ground again.

"Q. Had you been thinking about firing another shot? A. I had thought of firing another shot into the ground.

"Q. Had you thought of firing another shot and hitting him in the leg? A. I was shooting towards his legs."

That the defendant testified, "the entire transaction was accidental," as stated by the court in its comments, is not borne out by the former's testimony, which in that regard is as follows:

"A. Mr. Edwards said he wasn't going back. I stepped back, and as I stepped back my hand went to my side, and he says, 'Go ahead and draw your pea-shooter. If you do I will make you eat it.' And he kept coming towards me. I backed off and as I backed up he came very close to me, I would say in a foot of me. I pulled my gun and asked him to stop. He says, 'I ain't going to stop. Now that you have drawn it, I'm not going to stop,' and he made a pass for the gun. . . .

". . . A. He was walking towards me quite fast with a frown on his face, and he kept saying, 'I ain't afraid of you. I ain't afraid of you. I ain't afraid of any of you monkeys with uniforms.'

"Q. Were you afraid of him? A. I was getting scared, yes.

"Q. Of what? A. Of bodily harm. He said he was going to take the gun, and I was afraid he was going to take the gun, and that is the reason I drew it. . . .

". . . Q. So you became afraid that he was going to take the gun out of your holster, and you took it out, is that right? A. Yes, sir."

From the foregoing it must be held that the court incorrectly stated the facts, erroneously declared the law, and improperly invaded the province of the jury.

Finally respondent, in an effort to save this conviction, invokes the provisions of section 4½ of article VI of our state Constitution. It is asserted by respondent that "the record clearly shows the appellant to be guilty." Respondent's statement that "the evidence of defendant's guilt is clear and convincing" is not borne out when consideration is given to the fact that a jury remained unconvinced of his guilt after deliberating thereon for three entire days and returned a verdict only after their province as triers of fact was invaded by the trial judge in his comments to them. And in any event, the term "miscarriage of justice," as used in the constitutional provision, "does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied." (*People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971].) See, also, *People* v. *Duvernay,* 43 Cal.App.2d 823, 829 [111 P.2d 659]. Our views with reference to the applicability of section 4½ of article VI of the Constitution are set forth at length in *People* v. *Smittcamp,* 70 Cal.App.2d 741, 752, 753, 754 [161 P.2d 983], and cases therein cited. Under the facts of the instant case, "the conclusion is inescapable that the errors in this case resulted in a miscarriage of justice within the meaning of article VI, section 4½ of the California Constitution." (*People* v. *Dail, supra,* 659.) And furthermore, we hold that the errors complained of were prejudicial, deprived the defendant of that fair and impartial trial guaranteed by law, and that such procedure amounted to a denial of due process of law.

The judgment and the order denying defendant's motion for a new trial are, and each is, reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.