[Crim. No. 2133.  Third Dist.  June 21, 1949.]

THE PEOPLE, Respondent, v. ODELL HOOPER, Appellant.

John C. Henderson for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant, Odell Hooper, was convicted by a jury of the crime of robbery of the first degree and sentenced to San Quentin for the term prescribed by law. His motion for new trial was denied. From the judgment and from the order denying a new trial this appeal was perfected.

There is ample evidence to support the verdict and judgment. The only point urged on appeal is that the defendant was deprived of an impartial trial and due process by prejudicial conduct of the trial judge in discrediting defendant's testimony at the trial by his observations affecting the credibility of the witness, and also by his oral comments and instructions to the jury, pursuant to section 1439 of the Penal Code, and by his manner, gestures and language, tending to discredit the defendant's evidence.

The record shows that appellant lived with his wife in Oakland. She was employed for several years in a Naval Supply Store in that city.

The appellant had been acquainted with James Smith of Oakland for several months. Smith owned an automobile. In the forenoon of February 28, 1948, Smith called on appellant and asked him to ride with him in his machine to Vallejo. Hooper accepted the invitation and they first went to Richmond. Leaving that city about 3:30 p. m., they drove to Vallejo. They spent some time at various bars, playing games and drinking liquor. Hooper claimed that he had about $90 which his wife had delivered to him. About 7:30 that evening they drove to the outskirts of Vallejo and, for the

asserted purpose of obtaining some matches, they parked their car in the rear of the Variety Store owned and operated by Alex Schmall, and entered the store where they spent some time playing pin-pool and other chance games. Smith borrowed a dollar from Hooper, which he lost at some game. There were then no other customers in the store. Suddenly, Smith drew a revolver and flourishing it told the proprietor "it was a stickup." The appellant testified that he had not previously known that Smith had a revolver, or that he intended to rob that store or any other place; that when Smith displayed his revolver he said, "This is a stickup, lock that door, Odell"; that Smith repeated his command to Hooper, saying, "You heard what I said, lock the door and then go get that money"; that Smith then addressed himself to the proprietor, saying, "Give him that money, every nickel, or I will blow your brains out." The proprietor, Mr. Schmall, said that he proceeded to take from the cash drawer the sum of $45, which was all the money it contained, and handed it to Hooper. He testified, "I wasn't fast enough for him, I guess, and he [Hooper] said 'Make it snappy.' " Hooper took the money and went to the door, but a woman customer just then entered and Smith told her "this is a holdup," and ordered her to get over into a designated corner. Two or three other customers entered the store at that time and were likewise forced by Smith into the same corner. By means of threats to shoot them if they did not promptly obey orders, Smith robbed them of their purses.

In the meantime, Hooper left the store with the $45 which he received from the proprietor. Apparently he was not in the room when the customers were actually robbed by Smith. Hooper testified that when he left the store he went directly to their car and left the $45 on the cushion of the front seat, and that he then walked away. Smith testified at the trial of Hooper, corroborating much of his evidence regarding the affair. Smith said that he ordered Hooper to get the money from the proprietor, and that he (Smith) left the store immediately after getting the purses from the customers and went directly to their machine where he found the $45 on the cushion of the front seat; that he drove around the block and picked up Hooper on a near-by corner; that he took the money, aggregating the sum of $225, from the stolen purses in his possession, and threw the empty purses out on the pavement; that he offered to divide the stolen money with Hooper, but that Hooper refused to accept any portion of it, saying

that he was not implicated in the robbery. At the trial Hooper testified that he took the money from the proprietor only because he feared that Smith would shoot him if he did not obey his orders, and that he knew nothing of Smith's plan to stage the holdup.

After the robbery the young men drove back to Oakland. They were subsequently arrested and separately charged with the crime. They signed a written statement at the request of the officers, which contained some inconsistencies. Hooper claimed that he was coerced into signing the statement.

It appears that Smith was separately charged with the crime and that he either pleaded guilty or was convicted, for he was an inmate in San Quentin at the time he was called as a witness in the Hooper trial. Hooper was convicted of the crime as charged. His motion for a new trial, which was based on affidavits of prejudicial misconduct of the trial judge in his cross-examination of the defendant and in his oral instructions to the jury, was denied. From the judgment and order denying a new trial this appeal was perfected.

It is immaterial for the purpose of this appeal that there is ample evidence to support the judgment of conviction, or that the defense of Hooper may appear to be fictitious. The evidence was conflicting in that regard. The appellant contends that he had no knowledge that his companion, Smith, was armed with a revolver, or that he intended to stage a holdup. The appellant claimed that he obeyed the command of Smith and received $45 from Mr. Schmall, the proprietor of the Variety Store, only because he feared that he would be shot if he refused to do so, and that he did not *feloniously* take the money or participate in the robbery.

██ We are reluctant to reverse a judgment of conviction which appears to be amply supported by the evidence. But we are persuaded that the attitude, conduct, form of questioning the defendant on cross-examination and oral comments by the judge on the evidence which was given to the jury, together with his alleged manner of so doing, which was not refuted by counteraffidavit or otherwise, exceeded the province of the court and resulted in discrediting the evidence of the defendant to his prejudice. We are impelled to hold that the manner of cross-examination and oral comments on the evidence, considered as a whole, constitute reversible error.

There were some inconsistencies between defendant's testimony at the trial and his previous signed statement with

respect to his recognition of Mr. Schmall as the proprietor of the Variety Store where the robbery was committed, and as to whether he went there with his companion, Smith. When those inconsistencies were developed on cross-examination, the judge addressed the defendant and said, "You don't always tell the truth then, do you?" After the court had brought out the inconsistency by cross-examination, the judge closed that colloquy by again saying to him, "Then, I say, you don't always tell the truth, do you?"

The defendant testified that his wife, who had been working for several years in a Naval Supply Store, had delivered her earnings in the sum of $90 to him "to tote" for her, and that she had asked him that day to buy her a pair of stockings. Defendant's wife corroborated his testimony with respect to the delivery of her earnings. She said she gave him her check amounting to $131, out of which some bills were paid, leaving a balance in his possession of about $92. It was assumed by the prosecution that the $90 in question was not given to the defendant by his wife, but that it was a portion of the stolen money. The district attorney asked him on the stand if he had not "rehearsed this story quite a number of times." After an objection to the question had been overruled, the defendant replied, "No sir, I haven't." The judge then turned to the defendant and said: "Let me ask you this: Did your wife ask you to get her ninety dollars worth of stockings?" The defendant again attempted to explain his possession of the $90, and the court said, "What made her so benevolent?" The court closed that episode by again inquiring of the defendant, "Why did she give you ninety dollars to get a pair of stockings?"

After the defendant had testified that he and Smith had spent about 45 minutes in the Variety Store playing pin-pool and chance games, and that Smith then drew his revolver and commanded Hooper to take the money from the proprietor, the court then addressed the witness, Hooper, and said, "Weren't you fellows kind of stalling around and waiting until dark, about closing time, so that there wouldn't be any people coming in?" Other similar and sarcastic remarks were addressed to the witness which tended to discredit his testimony.

The court's oral comments to the jury upon the evidence, under section 1439 of the Penal Code, were transcribed and are before this court. They appear to be argumentative and partisan in effect. We are convinced the jury must have in-

ferred from the attitude and comments of the judge that he discredited the defendant's testimony and believed he should be found guilty of robbery. They were therefore clearly prejudicial. It is true that the challenged charge to the jury began and closed with statements that the jurors were the sole judges of the credibility of witnesses and the weight of the evidence. But it has been uniformly held that such instructions will not cure partisan statements which are prejudicial and necessarily result in a denial of due process. In this case the most harmful invasion of the rights of the defendant was the passionate manner in which the comments were alleged to have been delivered, by intonation and gesticulations, which was not denied by counteraffidavits or otherwise. In those comments the court marshalled seven separate inquiries, each of which commenced with the injunction that "You have the right to inquire:" (1) "Is it likely in the natural course of human events" that the defendant, through fear of receiving bodily injury from his associate, Smith, would obey his command to take the $45 from the proprietor, "without any previous agreement or arrangement" between them? (2) "If the defendant took the money from Schmall at the point of a gun and through compulsion by Smith, why he didn't take the money directly to Smith"; (3) "If there was no previous understanding between them, . . . why he [Smith] didn't direct the defendant to bring it and deliver it to him immediately"; (4) "If there was no previous arrangement between them, . . . why he [Hooper] took it and left the building without taking it directly to the witness Smith"; (5) "If he did take the money from Schmall and took it out the door, would he, as a reasonable man, dare do such a thing, or would he seem duty bound to take it directly to the witness Smith"; (6) "If he took it innocently, is it reasonable to suppose he would have [subsequently] met Smith and rode with him"; (7) "If there had been no previous arrangement between them, would Smith, as a reasonable man, having committed the crime of first degree robbery, been glad to get rid of the man with whom he had no previous arrangement, and would he have directed the defendant to deliver the forty-five dollars to him and let him [Hooper] get home the best way he could and take off by himself?"

We think the foregoing comments sound very much like the argument of an advocate of the guilt of the accused per-

son, in spite of the fact that the judge closed his remarks by stating that he was not passing on the weight of evidence or the credibility of any witness, and that those duties were solely within the province of the jury.

We conclude that the oral comments on the evidence, which we must assume were delivered to the jury in an impassioned and argumentative manner of an advocate, by means of undue emphasis, intonation and gesticulations, were prejudicial and prevented an impartial trial or due process.

We are aware of the fact that by the adoption of article VI, section 19, of the California Constitution in 1934, and section 1439 of the Penal Code in 1935, the power of the trial court to "comment on the evidence and the testimony and credibility of any witness" in a criminal case, was enlarged beyond the scope previously allowed by law in that regard. The word "comment" is derived from the Latin word "commentari," which ordinarily means to explain or construe, rather than to criticise.

It is true that it is impossible to apply a fixed rule to determine just what conduct or comments of a trial judge may amount to a prejudicial invasion of the rights of a defendant. "Each case must necessarily turn upon its own peculiar circumstances." (*People* v. *De Moss*, 4 Cal.2d 469, 477 [50 P.2d 1031].) ▇ But the rule is well established by numerous California cases, and by a multitude of authorities in other jurisdictions, that the conduct and comments on the evidence by the judge to the jury in a criminal case must be fair, temperate, judicial, dispassionate, and free from apparent contentiousness, partisanship or advocacy. It has been frequently held that such comments should not be argumentative. (*People* v. *De Moss, supra*; *People* v. *Patubo*, 9 Cal.2d 537, 542 [71 P.2d 270, 113 A.L.R. 1303]; *People* v. *Dail*, 22 Cal.2d 642, 657 [140 P.2d 828]; *People* v. *Talkington*, 8 Cal.App.2d 75, 90 [47 P.2d 368]; note, 113 A.L.R. 1312.)

The foregoing rule with respect to the prejudicial effect of the court's comments to the jury on the evidence and the credibility of witnesses, has been enforced and the judgments reversed on that account, notwithstanding the fact that the court also definitely instructed the jurors they were the sole judges of the weight of the evidence and the credibility of witnesses. (*People* v. *Patubo, supra*; *People* v. *Mason*, 72 Cal.App.2d 699, 711 [165 P.2d 481].) In the Mason case, last cited, the court quoted with approval at page 711 from the Talkington case, *supra*, which in turn quoted with ap-

proval from *O'Shaughnessy* v. *United States*, 17 F.2d 225, as follows:

" 'General statements in the charge to the effect that the jury are at liberty to disregard the court's views as to the defendant's guilt or innocence, and to base their verdict on their own conclusions from the evidence, do not cure the fault in the charge of a lack of impartiality in submitting the evidence to the jury, or justify the court in making one-sided recitals of evidence, or in furnishing arguments in behalf of only one side of issues, as to which the evidence is conflicting.' "

We are convinced that the challenged comments of the judge to the jury, particularly in view of the uncontradicted averments that they were made in an argumentative and partisan manner of an advocate, by means of his attitude, gestures, intonation and voice, were prejudicial to the defendant and deprived him of an impartial trial and due process. There was at least a conflict of evidence as to whether the defendant *feloniously* took the money from the proprietor of the store with intent to rob him, or, as he contended, that he merely obeyed the command of his armed associate and took it only to save himself from being shot, and that he had no previous knowledge that Smith was armed with a revolver or that he intended to commit robbery.

It is not our province to hold, upon a conflict of evidence, as a matter of fact, that the defendant was guilty of robbery, and that therefore the judgment should be affirmed under article VI, section 4½ of the Constitution, because there was no miscarriage of justice. A miscarriage of justice may result from a lack of due process, or from prejudicial denial of the rights of an accused person in the course of the trial. It extends beyond the mere question of whether an innocent man has been convicted, or a guilty man has been acquitted. In the Mason case, *supra,* it is said at page 716:

". . . And in any event, the term 'miscarriage of justice,' as used in the constitutional provision, 'does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied.' (*People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971].) See, also, *People* v. *Duvernay,* 43 Cal.App.2d 823, 829 [111 P.2d 659]."

And in *People* v. *Dail, supra,* it is said at page 659:

". . . In considering the effect of article VI, section 4½ of the Constitution, 'We are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.' (*People* v. *O'Bryan,* 165 Cal. 55, 66 [130 P. 1042]; see, also, *People* v. *Roe,* 189 Cal. 548, 561 [209 P. 560].) As stated in *Tupman* v. *Haberkern,* 208 Cal. 256, 263 [280 P. 970], 'Whether the error found to be present "has resulted in a miscarriage of justice" presents a question of law on the record before the court, and the purpose of the section [4½] was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies.' "

We conclude that article VI, section 4½ of the Constitution has no application to the circumstances of this case, and that it may not afford a cure for the prejudicial conduct complained of in this case. (*People* v. *Talkington, supra,* p. 100.)

*People* v. *Ramos,* 66 Cal.App.2d 731 [152 P.2d 758], upon which the respondent relies, is distinguishable from the present case. In that case this court affirmed a judgment of conviction of robbery, notwithstanding the voluntary comments of the trial judge on the evidence. The comments in that case were in nowise comparable to those which were made in the present case. But irrespective of the question of whether they appeared to be argumentative or partisan in character, there was no evidence in that case that the judge delivered his comments in the prejudicial attitude of an advocate, with gestures, intonation of voice, and argument so as to impress the jury with the fact that he discredited the defendant's testimony. Moreover, there was no evidence in that case of prejudicial statements made by the court to the defendant in the course of his cross-examination, as there is in the present case.

The other cases cited by the respondent, in which appropriate comments of the judge upon the evidence were approved on appeal, are likewise distinguishable from the present case.

The judgment and the order denying a new trial are reversed.

Adams, P. J., and Schottky, J. pro tem., concurred.