[Crim. No. 1183. Fourth Dist. Oct. 28, 1958.]

THE PEOPLE, Respondent, v. HAROLD TUCKER,
Appellant.

Isaac Pacht, Harvey M. Grossman, Richard Littell and Rudolph Pacht for Appellant.

Edmund G. Brown, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SHEPARD, J.—Defendant Harold Tucker was indicted by the grand jury of San Bernardino County with the crime of conspiracy to commit arson. (Pen. Code, § 182.) He was tried before a jury, found guilty, and sentenced to prison for the term provided by law. The gravamen of this case is the charge that the defendant actively persuaded two other men to combine together with the defendant in a plan to set fire to the place of business of a competitor, and that an overt act ripened the plan into a criminal conspiracy.

The primary basis of the defendant's complaint on appeal is his contention that the prosecutor was guilty of prejudicial misconduct in cross-examining character witnesses relating to specific instances of defendant's behavior not relevant to the traits of character being supported by the witness.

To clarify this contention we must review briefly the order and kind of evidence produced.

First, the prosecution produced its case in chief in a normal manner. Then the defendant personally and through other witnesses contradicted the alleged commission of the criminal act. After completion of the defense testimony the prosecution put on ordinary rebuttal material but added to it several witnesses attacking the defendant's veracity as a witness. Such witnesses testified that the reputation of the defendant for truth, honesty and integrity in the community of his residence

was bad. Thereafter, by way of surrebuttal and solely for the purpose of bolstering defendant's reputation for truthfulness, defendant offered several other witnesses. Nowhere in the case did defendant offer any witness on the subject of defendant's good character as to any traits of character which might be involved in the charge of conspiracy to commit arson.

It is in the cross-examination of the defense witnesses called to bolster up defendant's reputation for veracity that the alleged error occurs. In cross-examining each of these witnesses the district attorney asked the witnesses whether or not they had heard or knew of specific acts of misconduct. Each of the witnesses was not asked exactly the same set of questions but between all of them the district attorney brought out and inquired about 18 different types of assumed misconduct, and repeated his questions about such matters in such a way that the total number of times particular instances of assumed misconduct was called to the ears of the jury was more than 90.

These questions related to such matters as proposed violation of vice control laws, white slavery, encouragement of prostitution, friendship for and association with allegedly known gangsters, thinly veiled gangster strong-arm threats, malicious mischief, false insurance claims, theft, threats of arson, attempts to incite arson, broken church pledge promises, attempting to coerce women to prostitute, arson, juvenile delinquency, and obtaining property by false pretenses.

■ In analyzing what occurred in this trial it must be kept clearly in mind that witnesses as to a defendant's bad reputation (as to the traits involved in the charge at bar) may not be put on by the prosecution unless the defendant first chooses to make such reputation an issue by himself presenting witnesses to establish good reputation as to such traits. (*People* v. *Adams*, 76 Cal.App. 178, 184 [1] [244 P. 106]; *People* v. *Larrios*, 220 Cal. 236, 247 [5] [30 P.2d 404]; 18 Cal.Jur.2d 615.)

■ Clearly therefore, the prosecution's reputation witnesses could have been put on for no other purpose than to destroy defendant's value as a witness by attacking his bad reputation for veracity. Indeed, the question as to "truth, honesty and integrity" is the time-honored and recognized stock form of question used by lawyers and courts everywhere when inquiring as to a witness' reputation for veracity.

From this it is also perfectly clear that the defense, by way

of surrebuttal, could validly produce only such witnesses as might refute new matter produced by the prosecution on its rebuttal case. The only new matter produced by the prosecution as to reputation was the reputation evidence on defendant's veracity as a witness, referred to above. In addition, however, in order that this fact might be still more clear defense counsel (unnecessarily so, we think) changed the stock form of the question on veracity reputation to eliminate the word "integrity" and substituted therefor the word "veracity," so that his questions were all as to the general reputation of the defendant for "truth, honesty and veracity." The only time the word "integrity" was injected into any of the defense reputation witness questions was to the witness Netherton by the court itself, and not by defense counsel.

█ It is proper to ask a character witness whether he has heard that the person whose reputation is under investigation was accused of conduct inconsistent with the character attributed to him by the witness. But, in asking such questions, they must be confined to the traits of character that the reputation witness purports to be supporting. (*People* v. *Stevens,* 5 Cal.2d 92, 99 [5] [53 P.2d 133]; *People* v. *McKenna,* 11 Cal.2d 327, 335 [7] [79 P.2d 1065].)

█ In our opinion, questions about violation of vice control laws, white slavery, encouragement of prostitution, friendship for and association with allegedly known gangsters, gangster strong-arm threats, malicious mischief, threats of arson, attempts to incite arson, arson, attempting to coerce women to prostitute, and juvenile delinquency had no direct bearing on the subject of defendant's veracity as a witness, and even though we take the subject of inquiry to be the defendant's reputation on the subject conspiracy to commit arson (which in our opinion is not the correct view of the evidence), the questions relating to violation of vice control laws, white slavery, encouragement of prostitution, friendship for and association with allegedly known gangsters, theft, broken church pledge promises, attempting to coerce women to prostitute, juvenile delinquency and obtaining property by false pretenses would have no direct bearing on the traits involved.

In our opinion, the prosecutor in this case went entirely outside the realm of legitimate inquiry. It may well be that he was not consciously acting in bad faith, but that does not in any degree relieve or assuage the damage to the defendant.

 It often happens that the court gives adequate instruction that the inquired specific acts of misconduct is not to be taken as proof of the truth of the misconduct inquired about, and that instruction in correct form was given in this case. The failure to object by opposing counsel may also sometimes appear in the record. In innocuous cases where there is failure to object or where the court gives the proper instruction, and where a reviewing court can see that the ultimate result would not have been changed, the judgment will not be reversed for such error. (*People* v. *Hernandez,* 47 Cal.App.2d 132, 134 [3] [117 P.2d 394].)

 However, in the case at bar, with 18 different types of the worst kind of vilifying matters gone into by the prosecution, repeated a total of more than 90 times to the ears of the jury, every question by the prosecution being objected to and protested by defense counsel, with the court itself firmly supporting the right of the district attorney to inject these questions into the case, there is no possibility that the jury would not have been impressed beyond all hope of repair. In fact, a series of questions of this kind indirectly accusing the defendant of the vilest acts known to man, with the court staunchly supporting the questions, the jury must indeed have thought this defendant to be a slimy gutter rat, wholly beyond the pale of any human consideration whatsoever. In our opinion, there was no way by instruction or otherwise that the incalcuable damage done to the defendant by the quantum of this type of improper questioning could be alleviated.

"It does not reflect in any degree upon the intelligence, integrity, or the honesty of purpose of the juror that matters of a prejudicial character find a permanent lodgment in his mind, which will, inadvertently and unconsciously, enter into and affect his verdict. The juror does not possess that trained and disciplined mind which enables him either closely or judicially to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial matters within his knowledge . . . (*People* v. *Albertson,* 23 Cal.2d 550 [147 P.2d 7].)

" 'When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial

rights belonging to defendants shall be respected.' " *People* v. *Lyons,* 47 Cal.2d 311, 324 [303 P.2d 329] : '[In the circumstances the conviction cannot be supported by section 4½ of article VI of the state Constitution, for the denial of a fair trial is a miscarriage of justice. (*People* v. *Sarazzawski* (1945), 27 Cal.2d 7, 11 [161 P.2d 934] ; *People* v. *Hooper* (1949), 92 Cal.App.2d 524, 531 [207 P.2d 117] ; *People* v. *Mason* (1946), 72 Cal.App.2d 699, 716 [165 P.2d 481].)]' " (*People* v. *Black,* 150 Cal.App.2d 494 [310 P.2d 472].)

The other matters complained of are sufficiently covered by the foregoing discussion.

The judgment is reversed, and the cause remanded for a new trial.

Griffin, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied November 18, 1958.