STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
THOMAS J. O'SHEA, DEFENDANT-APPELLANT.

Argued May 24, 1954—Decided June 14, 1954.

(1)

*Mr. James A. Major* argued the cause for appellant (*Mr. Joseph A. Gaudielle,* attorney).

*Mr. Harold Kolovsky* argued the cause for respondent (*Mr. David M. Satz, Jr.,* on the brief).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. The defendant was allowed certification to review an Appellate Division judgment affirming his conviction in the Bergen County Court of the crime of bookmaking contrary to *R. S.* 2:135-3. *State v. O'Shea,* 28 *N. J. Super.* 374 (1953).

The State's proofs showed that two Hackensack police officers, Boulais and Hardy, acting on a complaint, had an automobile service station in Hackensack under surveillance on July 23, 1951. At 11:05 A. M. on that day defendant drove his car into the service station and remained there for

35 minutes until 11:40 A. M. When he drove away the officers followed in their squad car until he stopped at an intersection to wait for a traffic light change. Officer Hardy left the squad car and entered O'Shea's car, at O'Shea's right. When the light changed O'Shea on Hardy's instructions drove across the intersection and stopped his car at the curb. Boulais left the squad car and walked back to the driver's side of O'Shea's car. The officers told O'Shea he was wanted at police headquarters for questioning, and Boulais started back to the squad car. At that point O'Shea put into his mouth five papers which he attempted to chew and swallow. Boulais turned back and the two officers struggled with O'Shea until he disgorged the papers. It was proved at the trial that four of the papers were betting slips and that the fifth recorded accounts with bettors in addition to recording bets.

At police headquarters O'Shea was searched and on his person were found two copies of a "scratch sheet," *The National Racing Programs*, published that day, July 23, 1951, a copy of the *Joe and Asbestos Sports Weekly*, also of that date, a pad of white paper measuring four by six inches, one white business card imprinted with the names "Johnny and Tom" and a Hackensack telephone number, as well as checks totalling $260 and $156.37 in cash.

An expert witness testified that two of the betting slips which O'Shea had attempted to swallow bore notations which, read with the scratch sheet, showed bets on horse races to be run that afternoon at Monmouth Park, New Jersey. The expert also testified that the notations on another of the papers. a blank deposit slip of the Bogota National Bank, Bergen County, showed both bets and accounts of various bettors.

O'Shea moved for a judgment of acquittal at the close of the State's case upon the grounds that (1) bookmaking was not proved, and (2) even if bookmaking was shown, the State had not proved venue, that is, that the crime was committed in Hackensack as alleged in the indictment. The motion was denied, and O'Shea put in his defense, testifying in his own behalf.

4

The Appellate Division found that the evidence on the State's case supported an inference of bookmaking but was inadequate to support a finding that the crime was committed in Hackensack. The conviction was sustained, however, upon the basis that the deficiencies of the State's proofs to prove venue were supplied in the defendant's own testimony.

We agree that the proofs on the State's case amply sufficed to raise a jury question whether O'Shea was engaged in the crime of bookmaking within the tests laid down by our decisions. See *State v. Morano*, 134 *N. J. L.* 295 (*E. & A.* 1946); *State v. Bogen*, 23 *N. J. Super.* 531 (*App. Div.* 1952), affirmed 13 *N. J.* 137 (1953); *State v. Rhams*, 14 *N. J.* 282 (1954); *State v. Maranz*, 18 *N. J. Super.* 478 (*App. Div.* 1952), certification denied 10 *N. J.* 309 (1952); *State v. Lennon*, 3 *N. J.* 337 (1949). There is much more here than the mere possession of things appropriate to the bookmaker's calling suggested on behalf of O'Shea. His possession under the circumstances present imports the commission of the crime, or at least a jury could so find, when viewed against the setting of his attempt to suppress evidence, "always a prejudicial circumstance of great weight," 1 *Wharton, Crim. Ev.* (11th ed.), sec. 115, and the expert testimony that two of the slips noted bets on horse races to be run that very afternoon at Monmouth Park and that another, the bank deposit slip, noted accounts with bettors in addition to noting individual bets.

We think that the same proofs also justified a jury finding that the crime was committed in Hackensack, and we do not agree with the Appellate Division that O'Shea's testimony must be drawn in to prove that fact. We therefore have no occasion to consider, and expressly reserve, the question whether the conviction of a crime may be sustained if the accused, and not the State, completes the proof as to the venue of the crime. O'Shea's attempt to swallow the evidence of bets taken and of accounts with bettors when accosted by the officers, following so closely after his stay at the Hackensack service station, too prolonged to compel the inference that he was there merely to have his car serviced

or for some other innocent purpose, and the Hackensack telephone number on the "Johnny and Tom" business card (note that O'Shea's Christian name is Thomas) are particularly significant *indicia* from which a jury might infer that the crime was committed in Hackensack.

■ At all events, the evidence sufficed to withstand the motion for acquittal, for the reason given by the trial judge who invoked by analogy the rule applied in prosecutions for forgery. That rule is that evidence showing that the accused possessed the forged instrument when apprehended in a particular county is *prima facie* proof that the place of the forging was in the county and will suffice to support a jury finding that such was the case, at least in the absence of direct evidence showing the contrary or circumstances or testimony repelling that conclusion. *Annotation*, 164 *A. L. R.* 621, 650. The principle was originally stated by Mr. Justice Story in *United States v. Britton*, 24 *Fed. Cases, No.* 14, 650, *pp.* 1239, 1241 (*C. C.* 1822). His rationale was:

"* * * Acts of this sort are not usually done in the presence of witnesses; but in places of concealment, with a view to prevent detection; * * *. And I take the rule of law to be, that. the place, where an instrument is found or offered in a forged state, affords *prima facie* evidence, or a presumption, that the instrument was forged there, unless that presumption be repelled by some other fact in the case. * * * The rule, which I have stated, is not merely correct in a legal sense, but is the dictate of common sense and reason. If a forged instrument is found or uttered in one place, and there is no evidence to show, that it was forged elsewhere, what ground is there to presume, that it was not forged, where it was found, or uttered? If its existence in a forged state is not proved in any other place, it must, from the necessity of the case, be presumed to have been forged, where its existence in such state is first made known. And there is no hardship in such a presumption, for the prisoner, if he thinks the fact in his favour, can shew, where it was forged, for he has cognizance of the time and place, or at least can shew, what was its state, when it first came into his possession. If the law were otherwise, it would be almost impossible to convict any person of a forgery, for such acts are done in retirement and concealment, far from the sight of all persons but confederates in guilt."

Does not that reasoning have precise application here? We have said that the setting in which O'Shea was appre-

hended and his conduct at the time justified the jury in finding that the things in his possession evidenced that he had somewhere made book. Is he to escape just punishment for his crime because the State could offer no direct proof where he had completed the betting transaction or transactions involved? In these cases is not detection of the actual place or places where the bets were taken almost invariably a matter of the greatest difficulty? Bookmaking is an act done in concert. *State v. Lennon, supra.* The betting transaction between bettor and bookmaker may occur in a personal interview or over the telephone or by means of other communication media, and at any place—the bookmaking gentry requires no fixed place of business. Practitioners may carry the necessary tools about their persons and ply their trade on the street, in a shop or factory, or from the nearest telephone. The criminality of the pursuit makes the bookmaker cautious and furtive; certainly he has no desire to call attention to what he is doing. Thus, however complete the evidence found on him at the time of his arrest showing his commission of the crime, the place or places where the transactions with the bettors were actually carried on will seldom appear and can rarely be discovered except as they are revealed by the accused himself.

The place of transaction being, then, a matter peculiarly within the accused's knowledge, we perceive no reason for not according to the evidence found in his possession showing his guilt of the crime the additional *prima facie* effect that he committed the crime where apprehended, leaving to him the burden of showing another place. Certainly such an evidential rule in nowise prejudices any substantial rights of the accused, since by hypothesis the evidence suffices to support a finding of his actual commission of the crime. Mr. Justice Cardozo's comment is pertinent:

"But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained· till it is narrowed to a filament. We are to keep the balance true." *Snyder v. Massachusetts,* 291 *U. S.* 97, 122, 54 *S. Ct.* 330, 338, 78 *L. Ed.* 674, 687 (1953).

We have no hesitancy, then, in saying that the trial judge properly ruled that the things in O'Shea's possession which supported the inference of his guilt of the crime also sufficed as *prima facie* proof that the crime was committed in Hackensack.

Three additional points argued on the appeal were not urged as reasons for certification. O'Shea is therefore not entitled to be heard upon them; a petitioner allowed certification is limited on the appeal to argument of the questions presented and points raised on the petition for certification. *State v. Lefante*, 14 *N. J.* 584, 589 (1954). However, as the *Lefante* decision came down three weeks after O'Shea's petition for certification was granted, we have concluded to examine the merits of the additional points.

Two points go to alleged errors in the charge, and the third to the admissibility in evidence of the papers O'Shea attempted to swallow.

No objection was taken at the trial, as required by *R. R.* 3:7–7(*b*), to the portions of the charge now challenged, but at all events we find the charge unexceptionable.

Four of the five papers were admitted in evidence by consent, and the fifth was objected to only because O'Shea could not remember having it in his possession. We see no merit in the argument that, because the police officers struggled with O'Shea and forced him to disgorge the papers he was attempting to swallow, the papers were nonetheless illegally admitted in evidence under the United States Supreme Court's decision in *Rochin v. California*, 342 *U. S.* 165, 72 *S. Ct.* 205, 209, 96 *L. Ed.* 183 (1952). In the *Rochin* case morphine capsules were swallowed by the accused when he was arrested and the arresting officers took him to a hospital where the contents of his stomach was emptied through use of a stomach pump. Rochin was convicted of possession of morphine in violation of California law. The chief evidence against him was two capsules pumped from his stomach which were admitted over his objection. The Supreme Court's finding that he was denied due process in the circumstances rested upon conclusions that "the forcible extraction of his

stomach's contents  \*  \*  \*  is bound to offend even hardened sensibilities," "This is conduct that shocks the conscience," "They are methods too close to the rack and the screw to permit of constitutional differentiation." There is not the slightest similarity between the circumstances of that case and those present here. See *Irvine v. California*, 347 *U. S.* 128, 74 *S. Ct.* 381, 98 *L. Ed.* 561 (1954).

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.