[Crim. No. 7447. Second Dist., Div. One. May 26, 1961.]

THE PEOPLE, Appellant, v. ADOLPH OROZCO SEVILLA, Respondent.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Harry Wood and Ralph F. Bagley, Deputy District Attorneys, for Appellant.

Patrick E. Duggan for Respondent.

LILLIE, J.—An information charging defendant with possession of heroin in violation of section 11500, Health and Safety Code, was dismissed on defendant's motion under section 995, Penal Code. The People appeal from the order granting the motion.

While cruising in a narcotics car, A. F. Van Court, a narcotics officer of six years and familiar with narcotic transactions and the manner in which narcotics are received by users and addicts, observed defendant, whom he had known over five and one-half years, had "handled" on several occasions as an arrestee and investigated for use and possession, walk south on Haddon Street. From then until he later lost sight of him, Van Court, by "walkie talkie" radio, transmitted in detail everything he observed of defendant's actions to a felony unit consisting of four or five police cars cruising in the vicinity. He saw defendant enter and walk up a drive-

way at 10384 Haddon Street, stand by the stairway and back around the corner of the building; one Heredia, a known narcotic addict whom Van Court had arrested approximately three times over the past six years, came out onto the front porch. The two engaged in a conversation, and the officer saw a meeting of hands and defendant give something to Heredia; it also appeared that defendant dropped something, for he went to the ground and looked around, stood up and put his hand to his left shirt pocket. Defendant then walked north on Haddon; as cars approached him from the south, he ducked, ran between the houses and hid behind a hedge; when they passed he continued down the street. Van Court testified that it was his opinion that defendant's actions constituted a "narcotic transaction sale," and he told the moving units he "thought the peddler Junie (Heredia) had a customer coming," and that he " 'Baby' (defendant's street name) had scored." As he crossed Van Nuys, defendant faded from Van Court's sight.

Sergeants Olsen and Johnson were cruising in a narcotics car approximately one and one-half blocks from 10384 Haddon; they listened to Van Court's description of defendant's conduct and whereabouts, and when he lost sight of defendant, Olsen, who had "worked" on defendant for three and a half or four years, drove to the area and observed him hurrying— dog trotting—down Pinney Avenue. He swung his car across the sidewalk into a driveway blocking defendant, stopped the vehicle, "yelled" "police officer," jumped out of the car directly in front of defendant and arrested him. Defendant, who was about a foot away, reached into his left shirt pocket with his right hand and put it to his mouth; at the same time Olsen moved forward, placed his right arm around defendant's neck "pretty tight" and "whirled him around against the side of the police car," at which time he ordered defendant to "spit it out." A "rolling" struggle ensued wherein Olsen and defendant turned around as they moved backward toward the rear of the car. They covered a distance of 7 feet, 3 or 4 toward the car and 2 or 3 feet to its rear. Olsen again unsuccessfully ordered defendant to spit out the narcotics. With Olsen's arm tight around defendant's neck the two, turning around, slid along the door of the car to the rear, both bodies struggling against the side of the car; in the scuffle they leaned over the back of the trunk breaking off the aerial. During all of the time Olsen had his right arm around defendant's

neck and with his left hand he was trying to hold one of defendant's hands, with which he "was taking a beating," until he received assistance from Sergeant Johnson who took hold of defendant. Leaning over the fender, facing the rear of the car, with Olsen's arm around his neck and Johnson holding him, defendant, upon order from Olsen, then spat out onto the back of the car a cellophane package containing two capsules of heroin. The struggle lasted less than a minute during which time the officer held his arm around defendant's neck "trying to stop him from swallowing it"; three or four times the officer ordered defendant to spit out the object before he did so. In response to the question: "You were choking him and trying to keep him from swallowing; isn't that correct?" Sergeant Olsen testified, "I wasn't choking but my arm was around pretty tight, *yes,* but he was yelling."

■ In consideration of their past experience as narcotics officers, their knowledge of defendant and Heredia and their past activities, and their observations of the suspicious and furtive conduct of defendant, we find that the officers were justified in believing that defendant had committed a felony— a violation of the narcotic laws; and we conclude therefrom that there was reasonable and probable cause for defendant's arrest without a warrant. (*People* v. *Green,* 183 Cal.App.2d 736 [7 Cal.Rptr. 235]; *People* v. *Wilkins,* 178 Cal.App.2d 242 [2 Cal.Rptr. 908]; *People* v. *Fabela,* 175 Cal.App.2d 543 [346 P.2d 847].)

The basis of defendant's motion under section 995, Penal Code, was a denial of due process of law under the Fourteenth Amendment of the United States Constitution by the method the officers used in obtaining the evidence. The trial judge concluded that it had been obtained in a manner condemned by the Supreme Court in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], and granted the motion. Appellant herein argues "that the circumstances of the present case fall far short of the Rochin rule," citing in support of its contention numerous California cases wherein the reasoning of the Rochin case, *supra,* 342 U.S. 165, was rejected.

The official conduct denounced by the Supreme Court in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], (reversing *People* v. *Rochin,* 101 Cal. App.2d 140 [225 P.2d 1, 913]) included the deputies' actions from the time they observed Rochin put the capsules in his

mouth to the time he disgorged them. At the outset, the officers "jumped upon" him in an effort to extract the narcotics from his mouth; unsuccessful, they immediately took Rochin to a hospital where an emetic solution was forced through a tube into his stomach causing him to vomit into a pail from which were taken two capsules of morphine. Holding that the use of the capsules to obtain Rochin's conviction of illegal possession of the narcotic violated the due process clause of the Fourteenth Amendment, the Supreme Court said at page 172, ". . . we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents— this course of proceeding by agents of the government to obtain evidence is bound to offend even hardened sensibilities . . ."

It is true that *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], presents a factual situation not common to the ordinary case; and the majority of later cases offer facts neither supporting the kind of force censured in the Rochin case, *supra,* nor revealing more force than necessary for the purpose for which it was used. Whether such force exists in a given situation is purely a factual issue (*People* v. *Dawson,* 127 Cal.App.2d 375 [273 P.2d 938]; *People* v. *Dixon,* 46 Cal.2d 456 [296 P.2d 557]; *People* v. *Smith,* 50 Cal.2d 149 [323 P.2d 435]; *People* v. *Poole,* 174 Cal.App.2d 57 [344 P.2d 30]; *People* v. *Woods,* 139 Cal. App.2d 515 [293 P.2d 901]; *People* v. *Martinez,* 130 Cal. App.2d 54 [278 P.2d 26]; *People* v. *Kiss,* 125 Cal.App.2d 138 [269 P.2d 924]); likewise, the "indefinite and vague" confines of due process require an evaluation in each case. (*Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; *People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8].)

Part of the course of official conduct denounced by the court in the Rochin case, *supra,* 342 U.S. 165, and labeled that which "shocks the conscience," was "the struggle to open his mouth and remove what was there" (p. 172). (*People* v. *Haeussler,* 41 Cal.2d 252, 256 [260 P.2d 8].) Thus, since the Rochin decision, the courts have viewed a struggle in which force was used and the accused was choked in order to take

evidence from his person, as conduct offending due process. In *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26], after the officer observed the accused put narcotics in his mouth, he "placed a choke hold on defendant and ordered him to" spit them out (p. 55). A struggle ensued in which another officer joined and they fell to the ground with him where defendant spit out the package. Said the court at page 56, "The facts of the present case differ from those of the Rochin case only with respect to the variety of methods that were used on Rochin, who was either more durable than Martinez or was not choked as hard. *The question, however, is not how hard an officer may choke a suspect to obtain evidence but whether he may choke him at all.* It is clear that the substance was choked out of Martinez. The fact that the officers and Martinez were thrown to the ground indicates the extent of the force that was deemed necessary and that sufficient force was used to accomplish that purpose. The People say that the officers used only the force that was reasonably necessary to make an arrest. This statement ignores the evidence. . . . All this took place for the sole purpose of retrieving the package from defendant's mouth" (emphasis added).

Cases decided after the Rochin and Martinez cases reveal the court's careful examination of the record to determine if the conduct complained of included force resulting in choking the accused. In *People* v. *Smith,* 50 Cal.2d 149 [323 P.2d 435], the reasoning in the Rochin case was not applied because the Supreme Court accepted the trial court's finding that the defendant "spit it out" on request; citing *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26], it commented, "Although defendant's testimony would tend to show that the officer choked him, there was testimony to the contrary by one of the arresting officers" (p. 151). In *People* v. *Zamora,* 163 Cal.App.2d 400 [329 P.2d 531], the court in analyzing the evidence said at page 401, "She was not choked—she was asked to open her mouth, appeared to gag, and then spat the object into the officer's hand." Thus the issue before us resolves itself into whether the officers' conduct amounted to choking the capsules out of Sevilla; we are in accord with the trial court's finding that it did.

The facts in the instant case are similar to those found in *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26] ; but compared to the struggle described in the latter, the force used and Sevilla's resistance thereto appears to be even greater. Although not thrown to the ground, it is obvious

from the evidence that the force of the struggle was such that had the police car not been standing in the way and caught the bodies of Olsen and the defendant, the two would have been thrown to the ground. The reliability of the officer's statement that defendant ''was not thrown on the car'' in the struggle, is indeed questionable in view of his other testimony that after he saw defendant's hand go to his mouth, he placed his ''right arm around the top of his shoulder around his neck and *whirled him against the side of the police car,*'' at which time they were struggling; further that they ''slid along the door of the car to the trunk,'' and ''both leaned over the back of'' it; and that they ''were both against the car.'' The force with which the officer ''whirled'' defendant was enough to throw them to the ground, but because of the presence of the vehicle their bodies were thrown instead ''against the side of the police car''; otherwise the ''rolling struggle'' would have taken place on the ground. Their actions were ''fast''; in space they covered approximately seven feet; in time, less than a minute, during which the officer three or four times ordered defendant to spit out the narcotics. That the two men were thrown against the side of the car, that it was necessary for his partner to help Olsen, who had his arm ''tight'' around defendant's neck, hold defendant's arm to subdue him, and that when their bodies rolled to the rear of the car over the back of the trunk they broke off the aerial, indicate the extent of the force that was deemed necessary and was actually used to take the object from defendant's mouth.

As to how or in what manner the officer had his arm around defendant's neck, the officer finally answered in response to whether he was choking defendant, ''I wasn't choking but my arm was around pretty tight, *yes,* but he was yelling.'' We agree with the trial judge in his observation that ''although this officer said he wasn't choking him . . . I just can't see how an officer's arm could be around someone's neck pretty tight and not be choking.'' In like manner of the court's interpretation of the evidence in *People* v. *Martinez,* 130 Cal. App.2d 54 [278 P.2d 26], we conclude from the record before us that at the height of the struggle against the car, during which Olsen's arm was ''pretty tight'' around the defendant's neck, defendant was ''yelling'' and resisting, defendant's body was bent over the trunk of the car and Johnson was holding him and defendant on Olsen's order finally spat out

the capsules, ''the substance was choked out of'' him. (*People v. Martinez, supra,* p. 56.)

The evidence herein defeats any argument that the officers were justified in using this extent of force to effect defendant's arrest or to prevent him from fleeing, for the record plainly reveals that it was used for neither purpose, but according to Olsen's own statement, ''to stop him [defendant] from swallowing it.'' It also shows that at the time defendant was arrested he made no effort to resist or to get away; his only move was with his right hand to his mouth. Defendant's later resistance, when Olsen put his arm around his neck and ''whirled'' him against the car, was not for the purpose of fleeing, but to release his neck from Olsen's choke hold; defendant's ''yelling'' was more consistent with pain, trying to swallow and breathe, and to keep from being choked, than with resisting arrest or trying to get away. We can only conclude, as in *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26], and as admitted by Sergeant Olsen, that all of this took place for the sole purpose of ''trying to stop him [defendant] from swallowing it'' and retrieving the object from defendant's mouth.

Appellant has referred for our attention to *People* v. *Dixon,* 46 Cal.2d 456 [296 P.2d 557]; *People* v. *Dawson,* 127 Cal.App.2d 375 [273 P.2d 938]; *People* v. *Smith,* 50 Cal.2d 149 [323 P.2d 435]; *People* v. *Poole,* 174 Cal.App.2d 57 [344 P.2d 30]. These authorities are of little help to appellant for their factual situations are in no wise similar to either the one at bar or that in the Rochin case, *supra,* 342 U.S. 165, the reasoning of which the courts therein rejected for that very reason. For example, in *People* v. *Dixon,* 46 Cal.2d 456 [296 P.2d 557], the officers seized the arms of defendant to prevent her from placing a key in her mouth and in a struggle they put her on a bed and forced it from her hand; therein the court stated at page 458, ''The brutal and shocking force condemned in that case [*Rochin*] was not present here; no more force was used than was reasonably necessary to take the key from her hand.'' Again in *People* v. *Dawson,* 127 Cal. App.2d 375, 377 [273 P.2d 938], the court rejected the Rochin rule because '' [c]learly the facts in that case are not analogous with those in the present case . . .''; therein the officer merely put his arm around defendant's neck to hold him and told him to spit out the bindles, which he did. Appellant's contention that the facts before us are similar to those in the Dawson

case, *supra,* simply disregards the evidence which supports the finding that defendant was choked. In *People* v. *Poole,* 174 Cal.App.2d 57 [344 P.2d 30], the trier of fact found that though his arms were held the defendant spat out the narcotics at the officer's request; however, the court said that even assuming defendant's version to be true, none of the circumstances found in either *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26], or *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], in which defendant was choked, were present.

For the foregoing reasons the order granting the motion to dismiss is affirmed.

Wood, P. J., concurred.

FOURT, J.—I dissent.

The facts as set forth in the majority opinion should be extended in some respects. The officers knew the defendant was an old-time narcotics offender with whom they had dealt on several occasions. The probabilities are great that knowing of his background and his record as they did, they knew Sevilla to be an ex-convict. They knew of his habits and the course of conduct he followed when he had heroin in his possession. The officers also suspected, and with good reason, that Heredia was not only a user of narcotics but a peddler and they were staked out and watching Heredia's place. The officers knew that Heredia had been convicted of narcotics offenses on at least three occasions. They saw Heredia deliver something to the defendant and saw the defendant put whatever Heredia delivered to him into his shirt pocket. The defendant then left the peddler's house and furtively ran and zig-zagged in and out and from behind hedges upon the approach of automobile lights. All of the time the officers in the area were being fully advised as to what was taking place by a walkie-talkie type police radio system. When the defendant was confronted with the known police car in his path and with the officers who *immediately placed* him under arrest, he suddenly grabbed the heroin from his shirt pocket and put it into his mouth. Officer Olsen testified, ''I placed my arm around his neck and ordered him to spit out the narcotics. After a short struggle I was joined by Sergeant Karl Johnson who assisted in holding the defendant and he then spit out a cellophane package containing two capsules on to the back of the police car.''

When defendant was asked by the police where he had

secured the heroin defendant stated "downtown" and then said, "You guys know where I scored. Why do you ask me?" The defendant then related that it was his habit to run for a short distance, look around, walk and then run again when he possessed heroin and the officers advised him that they already knew of his habits in such connection.

On cross-examination Officer Olsen testified, "As I jumped out of the police car the defendant was approximately a foot or less from me. And as I had parked across the sidewalk directly in front of him as he was running he reached into his right—his left shirt pocket with his left hand, pulled his hand out of the pocket and stuck it into his mouth, at which time I placed my right arm around the top of his shoulder, around his neck and whirled him around against the side of the police car. *At which time he was struggling with me.*

"At this time Sergeant Karl Johnson came around and I believe took a hold of one of his arms. At least the struggle was much less.

"I then *instructed the defendant to spit out the narcotics* out of his mouth. He was still struggling. We slid along the door of the car to the trunk. We both leaned over the back of the trunk, and the aerial was broken off. He was facing the rear of the car or facing the trunk of the car. *I repeated that he spit it out again,* and the defendant spit it out on the trunk of the car.

"Q. Officer, the man was thrown on the car; is that correct?

"A. No, he was not thrown on the car.

"Q. Well, the aerial did break, is that correct, on the car during this struggle? A. *Yes, due to his efforts to get away.*

"The Court: *Was he trying to get away from you?*

"The Witness: *Yes.* We were both against the car. . . .

"Q. At that time you were trying to get whatever you thought was in his mouth out of his mouth; is that correct? A. I wasn't trying to. I had no hand on his mouth. I merely told him to spit it out.

"Q. I mean you had your hands around his neck telling him to spit it out; is that correct? . . .

"The Witness: One arm was around his neck and the other was trying to hold one of his *hands with which I was taking a beating at the moment* until I received assistance.

"The Court: *When did you place him under arrest?*

"The Witness: *As I stepped out of the car,* at which time he grabbed into his right—or left pocket with his right hand.

And I had been previously told by radio that he had been observed putting the narcotic, or what was presumed to be narcotics into his pocket. When his hand left his pocket and went to his mouth I was still trying to get to him from a foot away. It was very fast. I placed him under arrest. And at this time as I jumped he put up a little struggle. My arm was around his neck, and I did tell him to spit it out. *And I was trying to stop him from swallowing it.*

"Q. You were choking him and trying to keep him from swallowing it; isn't that correct? A. I wasn't choking but my arm was around pretty tight, yes, but *he was yelling.*

"THE COURT: Before you grabbed him, in your opinion, *did he make any movement away from you,* or did he appear to start in a direction away from you at all?

"THE WITNESS: *Yes, he did*—as I pulled in front of him had he not stopped I could have reached out and touched him, but he stopped and backed to the left as *I jumped out of the car, identified myself and placed him under arrest."* (Emphasis added.)

There was evidence that defendant was told on three or four occasions to spit out the heroin and that he did not comply with such reasonable directives.

At or near the close of the preliminary hearing the following questions, answers and statements were made:

"Q. You were on top, the defendant was on top of the car, is that correct? A. No, we were parallel. I was against the car and he was also.

"Q. From the time you started the struggle until the time you ended you had your arm around his neck, is that correct? A. I would say it was there the majority of the time, yes."

Defense counsel then stated to the court:

"MR. SALTER: Now, I would ask the court for a ruling, keeping in mind the four times he asked him to spit it out, having his hand around the defendant's neck, and, in his own words, trying to prevent the defendant from swallowing. Eventually the defendant did spit it out."

The court very apparently ruled against the defendant's contentions, and defendant was bound over for trial. The defendant did not testify and no witnesses were called in his behalf.

The objection to the receipt of the evidence was upon the ground of an illegal search and that there was a violation of

due process. Counsel relied almost exclusively on the Rochin and Martinez cases cited in the majority opinion.

The matter came before the superior court on a motion under section 995 of the Penal Code. The only record before the judge in the superior court was the reporter's transcript of the preliminary hearing.

The trial judge summed up his theory of the case by saying:

"THE COURT: Well, Mr. Mayerson, it seems to me it is just a question of whether or not the defendant was being choked for the purpose of retrieving the evidence or compelled to spit it up, or something of that nature. I agree that the defendant could be physically restrained and physical force used on him without violating due process of law. I don't think that it can be done, if he is actually being choked, and I think that it is the real issue in this case. The evidence is that at all times he had his arm around the defendant's neck.

"Although this officer said he wasn't choking him, he stated, 'But my arm was around pretty tight, yes.' This is the officer's testimony.

"I just can't see how an officer's arm can be around someone's neck pretty tight and not be choking."

The trial court then granted the motion to dismiss the action under section 995 of the Penal Code.

It appears that the majority opinion herein relies heavily upon the Rochin case. That case has been restated and discussed so many times that in the restating it has been, in my opinion, distorted. The facts in the Rochin case as taken from the original reporter's transcript and not from some other source are that Antonio Rochin lived in a two-story house. The officers, acting on suspicion, illegally entered his house in the morning (9 a. m.) on July 1, 1949, and went upstairs where they forced open the door of an upstairs room in which Rochin and a woman were present. The woman was in bed. She was living with Rochin although they were not married. Rochin was seated on the edge of the bed. One of the officers upon entry, saw two capsules wrapped in cellophane on the night-stand beside the bed. The officer asked "whose stuff is this?" and Rochin reached over, grabbed the capsules and placed them in his mouth. The officers attempted to get the capsules from his mouth and force was applied in an effort to pry open his jaws in an attempt to get him to eject the capsules. At that time Rochin apparently swallowed the capsules although he stated to the contrary. Rochin was then

handcuffed and taken to an emergency hospital where a medical doctor (M.D.) placed a rubber tube approximately one-quarter of an inch in diameter and about a foot in length down the throat of Rochin and then released through such rubber tube an emetic into Rochin's stomach. Two capsules still wrapped in cellophane were expelled by Rochin into a pail. The capsules contained heroin. Rochin offered no objection to the procedure. He got onto the operating table by himself. He did not state that he did not want any tube to be put into his body. In fact he quietly permitted the entire procedure. Rochin admitted that the capsules contained heroin and that he put the same into his mouth. He did not testify other than to state his name. He did not say that he had been manhandled or mistreated. Rochin was taken back to his house after the officers had recovered the capsules containing the heroin and at the house they found several empty capsules containing a white powdery substance and an outfit, or paraphernalia, used by addicts to inject narcotics into themselves. Fresh hypodermic marks were present upon the arm of Rochin. No one testified for the defendant as to what occurred at the hospital. It was stipulated that if Rochin was called he would testify that the capsules were taken from him without his consent and against his will.

The majority of the court in the Rochin case based its opinion upon the ground that the conviction violated the due process clause of the Fourteenth Amendment of the United States Constitution. The two concurring justices (Black and Douglas) relied upon the prohibition of self-incrimination as set forth in the Fifth Amendment of the United States Constitution (claiming that the Fifth Amendment imposed restraints upon the states as well as upon the Federal Government).

The majority in the Rochin case (342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183], U. S. Supreme Court Reports), in speaking of the court's responsibility with reference to due process, stated among other things:

"However, this Court too has its responsibility. Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the

most heinous offenses.' *Malinski* v. *New York, supra* (324 U.S. [401] at 416, 417 [89 L.Ed. [1029] 1039, 65 S.Ct. 781]). These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' *Snyder* v. *Massachusetts,* 291 U.S. 97, 105 [78 L.Ed. 674, 677, 54 S.Ct. 330, 90 A. L. R. 575], or are 'implicit in the concept of ordered liberty.' *Palko* v. *Connecticut,* 302 U. S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149].'' (*Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 188-189, 25 A.L.R.2d 1396].)

It was further stated in the Rochin case at pages 189-190 [96 L.Ed.] : ''The Due Process Clause places upon this Court the duty of exercising a judgment, within the narrow confines of judicial power in reviewing State convictions, upon interests of society pushing in opposite directions.

''. . . To practice the requisite detachment and to achieve sufficient objectivity no doubt demands of judges the habit of self-discipline and self-criticism, incertitude that one's own views are incontestable and alert tolerance toward views not shared. But these are precisely the presuppositions of our judicial process. They are precisely the qualities society has a right to expect from those entrusted with ultimate judicial power.

''. . . But that does not make due process of law a matter of judicial caprice. The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case 'due process of law' requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detached consideration of conflicting claims [citation] on a judgment not ad hoc and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society.''

And there then followed with reference to the conduct in the Rochin case the following at pages 190-191 [96 L.Ed.] :

''This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents

of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

". . . Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' . . .

". . . So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society."

The majority opinion closes with the following: "On the facts of this case the conviction of the petitioner has been obtained by methods that offend the Due Process Clause."

Mr. Justice Black referred to the standards of the majority with reference to due process as *"nebulous standards."* He further set forth at page 192 [96 L.Ed.]:

". . . The majority emphasize that these statements do not refer to their own consciences or to their senses of justice and decency. For we are told that 'we may not draw on our merely personal and private notions'; our judgment must be grounded on 'considerations deeply rooted in reason, and in the compelling traditions of the legal profession.' We are further admonished to measure the validity of state practices, not by our reason, or by the traditions of the legal profession, but by 'the community's sense of fair play and decency'; by the 'traditions and conscience of our people'; or by 'those canons of decency and fairness which express the notions of justice of English-speaking peoples.' These canons are made necessary, it is said, because of 'interests of society pushing in opposite directions.' "

Justice Black further stated: ". . . I am still in doubt as to why we should consider only the notions of English-speaking peoples to determine what are immutable and fundamental principles of justice."

The Justice referred to the majority standards as *evanescent* and concluded: ". . . I long ago concluded that the *accordion-like qualities* of this philosophy must inevitably imperil all the individual liberty safeguards specifically enumerated in the Bill of Rights."

Justice Douglas said: "The evidence obtained from this accused's stomach would be admissible in the majority of states

where the question has been raised. So far as the reported cases reveal, the only states which would probably exclude the evidence would be Arkansas, Iowa, Michigan, and Missouri. Yet the Court now says that the rule which the majority of the states have fashioned violates the 'decencies of civilized conduct.' To that I cannot agree. It is a rule formulated by responsible courts with judges as sensitive as we are to the proper standards for law administration.''

And, as Justice Douglas pointed out, it makes the rule turn not on the Constitution *"but on the idiosyncrasies of judges who sit here."*

The majority opinion in the case before us also refers at some considerable length to and relies upon *People* v. *Martinez*. I will content myself with a statement of the facts as I have taken them from the reporter's transcript in that case. They are as follows: One officer testified that the packaged material in question contained heroin. The second officer testified that he arrested Martinez at about 9 p. m. on November 23, 1953; that Martinez drove up in a Lincoln automobile, that the officer with his partners approached the car and identified themselves and as stated immediately observed the defendant put a white package to his mouth and begin chewing it. He continued, ''We entered the vehicle and by placing a choke hold . . . on him we ordered the defendant to spit out what he had put into his mouth and we fell to the ground with him and on the ground next to the curb I observed him spit out a small package which I recovered.'' The officer further stated that the defendant was in the car when one of the officers put a choke hold on him, that defendant was not rendered unconscious, that he became sleepy and groggy ''that his eyelids became droopy and his pupils were very pin-pointed and frozen and had no reaction to light.'' An objection was sustained as to what such a condition indicated to a narcotics police officer. (See later comment on results of taking narcotics orally.)

Martinez refused to go to a hospital. The choke hold was ''just a short time, a very short time.'' Any other statements of the conduct of the officer with reference to any violence at the time and place in question is pure conjecture and not based on what is set forth in the reporter's transcript.

The concern which I have is the trend of the courts to make it easier and easier for the nonconforming law violator to secure a release from charges properly brought, to the detriment of the large majority of decent and respectable citizens.

Even assuming that *Rochin* v. *California* was properly decided the case before us for determination is not comparable to Rochin's situation. There was an illegal and unlawful entry in Rochin's case—there was none here. There was an illegal and forced, violent breaking and entering of Rochin's bedroom—there was none here. In Rochin's case three officers "jumped upon him" and "grabbed him by the throat" and "began to squeeze his throat" and "force was applied to his throat," and an officer put his fingers into the mouth of Rochin. A rubber tube about a foot in length and about one-quarter of an inch in diameter was inserted into Rochin's mouth and down his throat, a fluid was put into the tube by a medical doctor for the purposes of having Rochin expel what the officers suspected was heroin. In the case before us no such conduct was even charged, let alone established. Furthermore, in *Rochin* the defendant was not under a valid and proper arrest at the time the officers were attempting to recover the heroin. In the case here Sevilla was under a good and sufficient arrest and in custody of the officers.

There can be no doubt that the officers and the medical doctor in the Rochin case apparently followed the standard medical practice recognized in practically every medical text; namely that when a person has swallowed what may very well be a lethal dose of poison his stomach is emptied of the poison. That does not, in my opinion, come close to the "rack and screw." If it does not shock the conscience of the medical profession and of those who are daily engaged in saving the lives of people who have taken an overdose of sleeping tablets in exactly the same fashion, it does not shock my conscience and I doubt that it shocks the conscience of the community. It appears to me to be an anomaly to accept as proper the conduct of the medical profession in expelling the contents of the stomach of a person who has mistakenly or intentionally taken poison, and at the same time to hold that the same procedure if used in running down the criminal element of the country "runs counter to the decencies of civilized conduct."

The medical texts, so far as I can ascertain, seemingly are in agreement as to what should be done if a person has swallowed heroin of an unknown quantity and unknown strength.

In *"Legal Medicine and Toxicology"* by Gonzales, Vance and Helpern, it is stated: "Heroin: Heroin is a synthetic alkaloid derived from morphine by replacing the hydrogen

atoms of the alcohol and phenol groups of this alkaloid by the acetic radical.

"Heroin acts like morphine, but differs in that it is more stimulating, depresses the cerebral centers less and the respiratory centers more; . . ."

Therein it is further stated: *"Acute poisoning by morphine may be produced by oral . . . administration*: it may be suicidal, accidental or homicidal in type. If the morphine is taken by ingestion, the symptoms appear in 20 to 40 minutes.

"The first symptom is a sense of mental stimulation and physical ease, with a quickening of the pulse which lasts a variable length of time. This is followed by dizziness, *drowsiness,* languor and nausea . . . there is a distinct desire to sleep, with gradual loss of muscular power and sensitivity

"Morphine exerts its toxic action on the central nervous system, affecting the higher cerebral centers first and then the vital centers of respiration. . . .

"*The fatal dose, in a case of acute morphine poisoning in a person who is not an addict, varies from one to six grains.* Circumstances may modify this lethal dose, . . .

"On the other hand, some people are susceptible to the drug and succumb to a small dose. . . . Addicts develop a tolerance to large quantities of morphine which, however, is not constant as it decreases whenever the use of the drug is discontinued for a long interval.

"The treatment of acute morphine and opium poisoning can be divided into the following steps:

"1. *Repeated evacuation of the poison from the stomach by the stomach tube,* as the drug is excreted continually and should be removed from time to time by gastric lavage. . . .

"The habituées find the effects of the physiologic dose pleasant and they gradually increase the amount until they can take enormous doses of the drug. Chronic poisoning may be caused by smoking crude opium, taking *opium preparations by mouth. . . ."*

It is then set forth: "After the clinician recognizes that he is dealing with a case of poisoning, his chief efforts are directed towards the treatment of the patient. The plan or procedure is as follows:

"1. *Removal of the poisonous material from the stomach.*

"2. . . . . . . . . . . . .

"3. . . . . . . . . . . . .

"4. . . . . . . . . . . . .

"5. *Preservation of material for chemical examination.*"

Under item number 1: (*"The removal of the poisonous material from the stomach is brought about by induction of vomiting, using emetics given by the mouth. . . .* The stomach pump or *the stomach tube can be used to empty that organ of its contents."*)

With reference to item number 5 it is said: "It is desirable for the clinician, whenever possible, to preserve a large quantity of the stomach contents or the stomach washings for chemical examination, especially if he is dealing with a case in which a toxic substance has been ingested." And, "Such preservation of such items assists the clinician to arrive at an early diagnosis and assists in the determination of what the treatment should be." (See also *"Clinical Toxicology"* by Thienes and Hailey.)

And, in *"A Manual of Pharmacology"* by Sollman under the topic of "treatment of acute morphine and opium poisoning" it is said: *"If the opiate was taken by mouth, the first indication is to empty the stomach.* If narcosis has already set in, emetics may act too slowly and the stomach tube should be used."

And, in *"First Aid Surgical and Medical"* by Cole and Buestow, at page 342 it is set forth: ". . . Heroin . . . are all opium derivatives. The triad of coma, pinpoint pupils and the depressed slow breathing are characteristic of poisoning. . . . *A stomach tube should be used to empty the stomach as soon as possible. . . ."*

I can readily conceive of a situation wherein if a medical doctor refused to proceed with one of the accepted procedures in a case where a person had swallowed heroin, he might very well be the recipient of a malpractice or other action. I can also conceive of a situation where if an officer neglected to take a person who had just swallowed two capsules of heroin of possible lethal character or of unknown quantity and strength to a hospital for a stomach washing and such person became extremely ill or died from such dosage of heroin, that such officer would be the subject of charges of dereliction of duty. It takes no great imagination on my part to believe that a considerable segment of the community would consider it brutal and shocking to the conscience for a policeman to neglect to have a person's stomach cleared of the poisonous material (under the circumstances) and thereby prevent such person from becoming deathly sick or perhaps from dying.

QUERY: If the police in the Rochin case had said in effect that in addition to getting evidence, they were attempting to

assist in saving the life of Rochin, would the conduct still be shocking, brutal, approaching the "rack and screw" and against all the decencies of civilized conduct?

As heretofore indicated, the amount of drug which can become fatal varies with the individual. The container of the drug also seemingly could make considerable difference; that is, whether it was of rubber, cellophane or tissue paper and whether it was permanently sealed or unsealed. The police certainly are not expected to believe the narcotics offender as to what he has swallowed or is about to swallow and surely no one would suggest the "wait and see what happens" policy. The narcotics user himself ordinarily has no way of knowing the quality of the heroin which he has purchased. It may be that the material is weakened or reduced or it just may be that it is of full strength.

As I view it a policeman has the duty to stop an individual from committing suicide and this is true even if such person objects to being assisted. The suspect under the circumstances in this case was in a position of choosing between swallowing the evidence and of being relieved of the heroin with the chance of some sort of incarceration. At that particular moment he apparently preferred to attempt to consume the heroin, even though it might very well have killed him. He may not even have known that he might die of the poison. It appears to me that the "community conscience," if it could speak, would say that where a suspect has swallowed a substantial amount of poison, immediate emergency measures should be taken to wash out the stomach by recognized medical standards. It is not to apply the "rack and screw," it does not in my opinion offend even ordinary sensibilities, let alone "hardened sensibilities," it does not offend the "sense of justice," it does not "afford brutality the cloak of law." In fact, in my opinion, it is basically humane and merciful.

The majority in the case before us have stated that "the issue before us resolves itself into whether the officers' conduct amounted to choking the capsules out of Sevilla . . ." Apparently, under their theory, if under any circumstances the heroin was choked out of Sevilla, he cannot be tried, and convicted. To choke is to render wholly or partly unable to breathe by pressing the windpipe—to stifle—to strangle—to stop the supply of breathable air. Defendant, according to testimony of the officer, "was yelling" while the officer had his arm "pretty tight" around his neck. A simple experiment can be made, namely, try "to yell" while being

unable to breathe. It is undisputed that the defendant was yelling. Furthermore, there were no bruises on Sevilla or other evidence of any harsh treatment by the officers. If perchance he had a sore neck for a day or two, he has no one to blame excepting himself. There was no atrocity by the officers in any sense of the word.

We must keep in mind that the defendant was "dog trotting" away from one set of officers into the hands of another set of officers and was in the commission of a felony in the immediate presence of such officers. The defendant was under arrest. He was resisting and was attempting to dispose of the evidence which in itself was a separate crime. Had the defendant been in a house and running to the toilet to the end that he could flush the evidence down the stool, surely the officers could have stopped him and used reasonable force in holding and keeping him away from the toilet bowl, even though it might have been necessary for three officers to put him upon the floor.

Assume for instance that the defendant had been guilty of an assault with a switch blade knife or with a gun and when the officers arrived the defendant had the knife or the gun in his hand. Are the officers to be prevented from using whatever force is reasonable and necessary under the circumstances to take the gun or the knife away from such an individual? Suppose Sevilla had put the heroin in his hand and then had clenched his fist. Is it arguable that the officers are to be rendered helpless and that they cannot compel the defendant, under such circumstances, to open up his hand and deliver up the evidence?

Assume that the alleged offender had stolen something (for example, ground glass) which the officer knew to be lethal in character if taken internally, and the offender in an effort to dispose of the evidence placed it in his mouth preparatory to swallowing it. Can the officer stop him from swallowing it and if so, how does he go about doing it under the standards set up by the majority in this case?

It has been held repeatedly that it is proper to take breath specimens and blood specimens. (See: *Block* v. *People* (1952), 125 Colo. 36 [240 P.2d 512], blood test without consent; *Kallnbach* v. *People* (1952), 125 Colo. 144 [242 P.2d 222], blood test without consent; *State* v. *Berg* (1953), 76 Ariz. 96 [259 P.2d 261], breath specimen taken forcibly; *Jones* v. *State* (1954), 90 Ga. 761 [84 S.E.2d 124], removal of gum wrapper from mouth; *State* v. *O'Shea* (1954), 16 N.J. 1 [105 A.2d

833], papers forcibly disgorged; *Breithaupt* v. *Abram* (1954), 58 N.M. 385 [271 P.2d 827], blood test without consent; *People* v. *Spears* (1952), 201 Misc. 666 [114 N.Y.S.2d 869], breath specimen; *People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8], blood test without consent.)

In *Ash* v. *State,* 139 Tex.Crim.Rep. 420 [141 S.W.2d 341], the offender attempted to hide some stolen rings upon his being apprehended by the officers by placing the rings in his mouth and swallowing them. He was taken to a hospital and fluoroscoped. The rings were established to be in the lower bowel. He steadfastly refused to permit his bowels to move and pass the rings. By the use of an enema the offender, contrary to his wishes, was caused to eliminate the rings. The procedure used by the police and the conviction were affirmed.

In *Taylor* v. *State,* 90 Okla.Crim.Rep. 283 [213 P.2d 588], some rings were stolen. The suspects were arrested. X-ray pictures were taken of one of the suspects. The picture showed two rings in the stomach of the suspect. He was given castor oil and the rings were recovered. The conviction was affirmed. If we assume that a defendant possesses heroin and upon the approach of the police he secretes the contraband into his anus, what are the officers to do under the standards set up in this case?

Section 196 of the Penal Code provides: ''Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either——

''1. . . .

''2. When necessarily committed in *overcoming actual resistance . . . in the discharge of any . . . legal duty;* or,

''3. . . . when necessarily *committed in arresting persons charged with felony,* and *who are fleeing from justice* or *resisting such arrest.''* (Emphasis added.) (See *People* v. *Brite,* 9 Cal.2d 666 [72 P.2d 122] ; *People* v. *Lillard,* 18 Cal.App. 343 [123 P. 221] ; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73] ; *People* v. *Mason,* 72 Cal.App.2d 699 [165 P.2d 481] ; see also Pen. Code, § 197, subd. 4.)

What do these sections, which have been in the books since 1872, mean in 1961 in the light of this decision? Does it mean that if the alleged offender is successful in his effort to escape from the officers' immediate hold that the officer can use deadly force to prevent his complete escape but at the same time he cannot do what the officer did in this case in an effort

to stop the offender from destroying the evidence of his crime? It appears to me to make for a preposterous situation.

There can be no denial of due process found in the absence of a clear showing of police brutality. (See 25 So. Cal. L. Rev. 357; 22 Tenn. L. Rev. 568, 570.)

What the majority in this case seemingly have done in effect is to stretch the due process clause into a rule which favors the hardened tough criminal, shackles the police and cripples society. The due process clause is nothing more nor less than an expression of a social ideal in pursuance of which an attempt is made to balance the interests of the individual against those of society. The aim is to prohibit fundamental unfairness in the use of evidence. The rule as applied by the majority in this case in effect allows or permits the criminal to set the pace. If the criminal puts up a violent fight and resists arrest and search when he is committing a felony in the immediate presence of the officers and attempts to destroy the evidence of his crime, then the criminal is to be released if the officer has made any substantial effort to stop him. In other words, it encourages and is tantamount to advice to narcotics addicts and peddlers to swallow or attempt to swallow the evidence if the police arrive and to fight hard if the police attempt to interfere. In short, a defendant creates a right by resorting to violence and attempting to dispose of the evidence of his crime.

The police are expected by the general public to do a commendable, efficient and prompt job of protecting society against criminals. In this case it would appear that the police were making a conscientious endeavor to perform their duties. There was no cynical contempt for the law by the officers. The enforcement agencies are deserving of at least an even start in the race with the criminal element and should not be handicapped to the point of absurdity. I cannot believe that the founders of our government in writing the Constitution, ever deliberately designed a refuge for criminals or suspected that the articles which they wrote would one day be the main shelter for the gangster, hoodlum and professional crook as against society.

The majority in this case question the reliability of the statements of the testifying officer. A reading of the testimony indicates to me that the officer was telling the truth. The only judge who heard the testimony given and who saw the witness testify apparently believed him. In any event

it is not the province of this court to determine the reliability or credibility of the witness.

The majority further indicate that the force applied in this case was greater than the force applied in the Martinez case. I am at a loss to know how this court can determine, under the circumstances and from the testimony in the transcripts, in which case the greater pressure or force was applied.

The majority also determine that the force which was applied to Sevilla was to stop him from swallowing the evidence and not to prevent him from escaping. No one knows the true answer to that situation except the officer. We do know, however, that the officer testified that the defendant was attempting to escape and that the officers were attempting to prevent him from so escaping. The majority relate why the defendant was struggling and resisting, in spite of the fact that the record indicates that the defendant did not testify nor did anyone testify in his behalf as his witness. Such interpretation appears unwarranted and is nothing short of armchair speculation.

The exclusionary rule is a creature of judicial policy and when extended to the limits as here contemplated, society as a whole is punished, crime is not suppressed and unfortunately the police are disciplined and made to appear as culprits, when, as in this case, they are performing their duty honestly and well.

Wigmore appropriately said, ''The judicial rules of evidence were never meant to be an indirect process of punishment'' (8 Wigmore, Evidence, § 2183), and he could have been referring to a situation like the case at hand when he said it is ''misplaced sentimentality.'' The rule, under. the circumstances here, makes for judicial suppression of the truth. It places courts in the position of palliating the offense in the face of irrefragable proof of guilt. That to me encourages delinquency, racketeering and other crimes.

I am convinced that public policy does not dictate, under the circumstances of this case, that the defendant should be released at the expense of repression of the narcotics traffic. The exigencies of the situation were met by the officers in a timely and humane fashion. The majority seem to reason in effect that the defendant should have been permitted to swallow the evidence. This, in my opinion, for the reasons heretofore stated, is not tenable and will handicap law enforcement

594

to a ridiculous extent if any such rule is permitted to stand. The law should not suffer itself to bring about its own destruction.

In a recent editorial in the American Bar Journal entitled "The Odds Favor the Criminal" it is stated, after a pointing up of the favorable possibilities for a criminal:

"Certainty as to punishment, promptness of punishment and finality of punishment are the three essentials to good law enforcement.

"This is a state of affairs that requires clear thinking on the part of all lawyers. We in America emphasize the great value of liberty and the importance of sympathy for the accused. *The law abiding citizen and the public are entitled to deeper sympathy on the part of our judges. The basic purpose of the criminal law is to protect society, not the criminal.* When crime does not pay—then law is respected. When crime does pay—and it does pay 80 percent of the time today—then no citizen's life or property is secure.

"Here is a field which needs some straight thinking on the part of all lawyers and all law enforcement officers."

I would reverse the order.

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1961. Schauer, J., McComb, J., and Peters, J., were of the opinion that the petition should be granted.